IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ST. LUKE'S HOSPITAL                             *
801 Ostrum Street
Bethlehem, Pennsylvania 18015                   *

     Plaintiff,                                *

          v.                           *    CIVIL CASE NO.:_____

MICHAEL O. LEAVITT, as Secretary of            *
Health and Human Services,
200 Independence Avenue, S.W.                   *
Room 615F
Washington, D.C. 20202                          *

Serve:                                          *

1.   The United States Attorney                  *
     for the District of Columbia
    555 4th Street, N.W.                        *
    Washington, D.C. 20530
                                                *

2.   The Attorney General of the United States
    U.S. Department of Justice                  *
    950 Pennsylvania Avenue, N.W.
    Washington, D. C. 20530-0001                *

3.   The Secretary of Health and Human           *
    Services,
    c/o Office of the General Counsel           *
    Hubert H. Humphrey Building
    Room 713F                                   *
    200 Independence Avenue, S.W.
    Washington, D.C. 20201                      *

     Defendant.                                *
                                               ***

COMPLAINT FOR JUDICIAL REVIEW OF FINAL
ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

    Plaintiff St. Luke's Hospital, successor-in-interest to Allentown Osteopathic Medical

Center, by its undersigned attorneys, hereby files this Complaint. This action involves the failure

of Defendant Michael O. Leavitt, Secretary of Health and Human Services, to reimburse the Plaintiff amounts to which it is entitled under the Medicare program, namely reimbursement for its loss incurred on a statutory merger with an unrelated entity.

## PARTIES

1.     During the relevant time period, Allentown Osteopathic Medical Center was a non-profit hospital located in Allentown, Pennsylvania. Allentown Osteopathic Medical Center was certified as a "provider of services" participating in the Medicare Program within the meaning of 42 U.S.C. § 1395x(u). St. Luke's Hospital is a non-profit corporation located in Bethlehem, Pennsylvania, and is the successor-in-interest to Allentown Osteopathic Medical Center, as further described in paragraph 23 of this Complaint.

2.     Defendant Michael O. Leavitt, Secretary of Health and Human Services (hereinafter, "Secretary" and "HHS"), is responsible for the administration of the Medicare Program under Title XVIII of the Social Security Act, as amended. 42 U.S.C. §§ 1395-1395ggg (hereinafter, the "Act"). Pursuant to Medicare regulations, the Secretary is the real party in interest in the administration of the Medicare Program. 42 C.F.R. § 421.5(b). The Centers for Medicare and Medicaid Services (hereinafter, "CMS") is the operating component of HHS charged with the administration of the Medicare Program. During the cost reporting period at issue, CMS was known as the Health Care Financing Administration (hereinafter, "HCFA").

## JURISDICTION AND VENUE

3.     This action arises under the Medicare statute (Title XVIII of the Act), 42 U.S.C. §§ 1395-1395ggg; the Administrative Procedure Act, 5 U.S.C. §§ 553-808 (hereinafter, the "APA"); and the Declaratory Judgment Act, 28 U.S.C. § 2201. The action is based upon the failure of the Secretary to reimburse Allentown Osteopathic Medical Center for certain costs

related to its provision of health care services to Medicare beneficiaries, namely, compensation for the loss it incurred from its statutory merger with an unrelated party.

4.      This court has jurisdiction under 42 U.S.C. § 1395oo(f)(1).

5.      Venue lies in this judicial district pursuant to 42 U.S.C. § 1395oo(f)(1) and 28 U.S.C. § 1391.

## MEDICARE STATUTORY AND REGULATORY FRAMEWORK

6.      Title XVIII of the Act establishes a program of health insurance for the aged and disabled commonly known as "Medicare." 42 U.S.C. §§ 1395-1395ggg. The Medicare program is divided into four parts, Part A through Part D. Part A and Part B of the Medicare program are the only parts that are relevant to this proceeding. Part A (the hospital insurance program) provides for reimbursement of inpatient hospital services. 42 U.S.C. §§ 1395c-1395i-5. Part B (the supplemental medical insurance program) pays for various health services not covered by Part A, including physician services and hospital outpatient services. 42 U.S.C. §§ 1395j-1395w-4j.

7.      To participate in the Medicare program, a hospital must file a "provider agreement" with the Secretary. 42 U.S.C. § 1395cc.

8.      Payment to providers of Medicare services is made through fiscal intermediaries pursuant to contracts with the Secretary. 42 U.S.C. § 1395h.

9.      The fiscal intermediary for Allentown Osteopathic Medical Center during the period at issue was Veritus Medicare Services ("Intermediary"). The Intermediary was responsible for Medicare audit of, and payment to, Allentown Osteopathic Medical Center.

10.     Historically, the Medicare program reimbursed hospital services on a "reasonable cost" basis. 42 U.S.C. § 1395f(b). Section 1861 of the Act requires that the reasonable cost of services reimbursed under the Medicare program be determined in accordance with regulations

- 3 -

promulgated by the Secretary. 42 U.S.C. § 1395x(v)(1)(A). During the relevant time period, Section 1861 of the Act also required the Secretary to provide for recapture of depreciation in the same manner as provided under the regulations in effect on June 1, 1984. 42 U.S.C. § 1395x(v)(1)(O).

11.    Since its inception, Medicare regulations have recognized that depreciation represents a reasonable cost of services required to be reimbursed under the Medicare statute. *See* 42 C.F.R. § 413.134. Recognition of depreciation compensates a provider for an asset's loss of value resulting from its use in furnishing services to Medicare beneficiaries. Medicare reimburses depreciation costs to a provider on an annual basis, based on the historical cost of each depreciable asset divided by its estimated useful life. Generally, if upon disposal of a depreciable asset, a Medicare provider receives more than the asset's historic cost less previously recognized depreciation allowances ("Medicare book value"), then a gain occurs. In that event, Medicare recognizes the gain in the determination of the provider's allowable cost and recoups previously paid reimbursement for depreciation. Generally, if upon disposal of a depreciable asset, a provider receives less than the asset's Medicare book value, then Medicare recognizes the loss in the determination of the provider's allowable cost and pays additional reimbursement to compensate the provider for the previously unrecognized depreciation.

12.    Medicare depreciation regulations addressing statutory mergers ("Statutory Merger Regulation") require that, upon the statutory merger of two or more corporations that are unrelated, assets of the merged corporation be "revalued." The merged corporation, if a Medicare provider, is required to recognize any gain or loss incurred on the transaction. 42 C.F.R. § 413.134(l). The merged entity's gain or loss is determined based on a comparison of the consideration received for its depreciable assets and their Medicare book value.

– 4 –

13.    The Social Security Amendments of 1983, Pub. L. 98-21, 97 Stat. 65 (1983), created a new method for payment of hospital inpatient services based upon a prospective payment system. Effective for cost reporting periods beginning on or after October 1, 1983, Medicare began paying hospitals for certain inpatient operating costs based on a beneficiary's diagnosis at the time of discharge. The amount per discharge varies according to the diagnosis-related group into which the patient's treatment falls. 42 U.S.C. § 1395ww(d).

14.    The Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 4006(b), 101 Stat. 1330, 1330-52 (1987), required payments for certain capital-related costs of hospitals to be made in accordance with a capital prospective payment system established by the Secretary, effective for cost reporting periods beginning on or after October 1, 1991. Medicare regulations implementing the statutory directive are at 42 C.F.R. § 412.300, *et. seq.*

15.    The statutory and regulatory amendments providing for use of a prospective payment methodology to pay for hospital inpatient operating costs and capital-related costs did not, however, result in a change to Medicare regulations addressing depreciation and gains and losses from statutory mergers.

16.    Medicare providers are required to file annual cost reports with their fiscal intermediaries. Within twelve (12) months following the receipt of a cost report, the intermediary is required to send the provider a notice of amount of program reimbursement (hereinafter, "NPR") setting forth the amount of payment due to the provider by Medicare. 42 C.F.R. §§405.1803(a), 405.1835(c). The NPR is considered the intermediary's final determination of total Medicare reimbursement due to the provider for the Medicare cost year to which the NPR relates.

17.    A provider that is dissatisfied with the determination reflected in its NPR may, provided that the amount in controversy exceeds $10,000, request a hearing before the Provider

- 5 -

Reimbursement Review Board (hereinafter, "PRRB"), by filing an appeal within one hundred eighty (180) calendar days from the date of receipt of its NPR. 42 U.S.C. § 1395oo(a); 42 C.F.R. §§ 405.1801-405.1889.    The PRRB has the authority to affirm, modify, or reverse an intermediary's determination reflected in the NPR. A PRRB decision becomes final sixty (60) days after the receipt of the PRRB's decision unless, within that time, the provider requests judicial review or the CMS Administrator reverses, affirms or modifies the PRRB decision. 42 U.S.C. § 1395oo(f)(1).

18.    A provider may obtain judicial review of a final decision of the PRRB, or of the reversal, affirmation, or modification by the CMS Administrator of a PRRB decision, by filing a civil action within sixty (60) days of the date on which the provider receives notice of (1) a final decision by the PRRB or (2) any reversal, affirmation, or modification by the CMS Administrator. *Id.* A provider that seeks judicial review and is the prevailing party in such litigation is entitled to interest on the amount in controversy from the first day of the first month beginning after the end of the one hundred eighty (180) day appeal period referenced above. 42 U.S.C. § 1395oo(f)(2).

## FACTS OF THE DISPUTE

19.    Prior to the statutory merger transaction described below, Allentown Osteopathic Medical Center was a small community osteopathic hospital serving the Lehigh Valley area of Pennsylvania.

20.    From the Medicare program's inception until the statutory merger described below, Allentown Osteopathic Medical Center received Medicare depreciation allowances based on the historic cost of its depreciable assets and Medicare useful life guidelines.

21.    During the periods immediately preceding the statutory merger described below, Allentown Osteopathic Medical Center was unable to participate in managed care arrangements

– 6 –

to the same extent as competing hospitals and had the smallest share of the Lehigh Valley hospital market. Allentown Osteopathic Medical Center was operating less than one-half of its licensed beds and was losing approximately $1 million each year. Allentown Osteopathic Medical Center's physical facility was old and in disrepair, and there was substantial risk that if a major system failed, it would be unable to obtain replacement parts.

22.     Given the state of Allentown Osteopathic Medical Center's physical facility and its inability to satisfy the financial obligations that would be necessary to build a new hospital, remaining as an independent hospital was not a viable option. After exploring potential arrangements with other health systems, Allentown Osteopathic Medical Center's governing board determined that a transaction with St. Luke's Medical Center was the best available alternative.

23.     Effective January 1, 1997, Allentown Osteopathic Medical Center merged into St. Luke's Hospital, which was the surviving entity in the statutory merger. The merger transaction was entered into in good faith and complied with all applicable legal requirements. Under Pennsylvania law, St. Luke's Hospital succeeded to Allentown Osteopathic Medical Center's assets and liabilities, including Allentown Osteopathic Medical Center's Medicare claim for reimbursement for the loss on statutory merger that it incurred. Under Pennsylvania law, the corporation that merged into St. Luke's Hospital, Allentown Osteopathic Medical Center, ceased to exist as a result of the statutory merger.

24.     At the time the terms of the statutory merger transaction were negotiated, when the transaction documents were executed, and when the statutory merger occurred, Allentown Osteopathic Medical Center and St. Luke's Hospital were neither subject to common ownership nor common control. Accordingly, the transaction was a statutory merger between two unrelated

– 7 –

parties, as the Intermediary determined at the time of audit and confirmed in written stipulations filed with the PRRB.

25.    Allentown Osteopathic Medical Center incurred a loss on the statutory merger. Allentown Osteopathic Medical Center received $4,848,188 consideration for all of its assets, reflecting its liabilities that passed to St. Luke's Hospital. Medicare payment principles provided for assignment of $2,321,176 to its depreciable assets, including parking lot, building and improvements, fixed equipment, and moveable equipment. Allentown Osteopathic Medical Center's depreciable assets had a Medicare book value of $12,051,404. Accordingly, Allentown Osteopathic Medical Center incurred a loss of $9,730,228 on those assets. Medicare's portion of the loss was $2,865,338, reflecting Medicare's relative use of the facility during the period in which Allentown Osteopathic Medical Center's depreciable assets were used to furnish patient care services.

26.    In completing its Medicare cost report for the period ending December 31, 1996, Allentown Osteopathic Medical Center claimed reimbursement for Medicare's share of the loss on depreciable assets that it calculated had been incurred on the statutory merger.

27.    During the course of the audit, the Intermediary proposed an adjustment to recognize Allentown Osteopathic Medical Center's loss, with a small reduction to the amount claimed. However, after consultation with HCFA, the Intermediary ultimately determined to disallow Allentown Osteopathic Medical Center's full loss claim. The Intermediary determined that the transaction was not a *bona fide* sale, as required for Medicare to recognize the loss, because of the disparity between the consideration received and the related net book value of the assets. The Intermediary's audit determination was reflected in an NPR dated August 6, 1999.

– 8 –

## ADMINISTRATIVE APPEAL PROCESS

28.     On January 21, 2000, Allentown Osteopathic Medical Center timely filed its notice of appeal and request for hearing with the PRRB challenging disallowance of the loss claim pursuant to 42 C.F.R. §§ 405.1835–.1841. The amount of Medicare program funds in controversy was approximately $2.9 million. Allentown Osteopathic Medical Center satisfied the jurisdictional requirements set forth in applicable Medicare statute and regulations.

29.     While Allentown Osteopathic Medical Center's appeal was pending before the PRRB, CMS issued additional Medicare Program guidance that reversed longstanding agency policy related to recognition of gains and losses from statutory mergers, reflected in section 4502.6 of the Medicare Intermediary Manual and in correspondence from senior agency officials. On October 19, 2000, CMS issued a Program Memorandum to its fiscal intermediaries requiring disallowance of loss claims resulting from mergers and consolidations involving non-profit providers where consideration paid for the assets was considered unreasonable. The Program Memorandum required a statutory merger between unrelated parties to be a "*bona fide sale*" before recognition of any related gain or loss, and, based on a definition of that term added to the Provider Reimbursement Manual ("PRM") in May 2000 ("Bona Fide Sale Definition"), required related consideration to be "reasonable." The agency had previously interpreted Medicare regulations to require recognition of a gain or loss if it was incurred on a transaction that was a statutory merger and the transaction was between unrelated parties. The agency had not previously applied regulations addressing *bona fide* sales of assets to statutory mergers, or required that the consideration for the merged entity's assets – its liabilities that were assumed by the surviving entity – be considered "reasonable" or reflect the assets' fair market value.

30.     On January 24, 2008, the PRRB issued its decision reversing the Intermediary's determination disallowing Allentown Osteopathic Medical Center's claimed loss. A copy of the

– 9 –

PRRB's decision is attached as Attachment A. The PRRB concluded that because, as the parties had agreed, the transaction was a statutory merger and because the parties had stipulated that Allentown Osteopathic Medical Center and St. Luke's Hospital were unrelated parties, Allentown Osteopathic Medical Center was entitled to reimbursement for its loss on statutory merger in accordance with the specific and plain meaning of the Statutory Merger Regulation. The PRRB stated that under the controlling regulation, the transaction was not required to satisfy the *bona fide* sale requirement addressed in another regulatory provision.    The PRRB's determination requiring recognition of Allentown Osteopathic Medical Center's loss reflected the terms of Medicare regulations to which it was bound, interpretations required to be afforded great weight, and long-standing Medicare program policies. The PRRB remanded the action to the Intermediary for review and audit of the calculation of the loss, and for the Intermediary to reduce Allentown Osteopathic Medical Center's loss to account for any depreciation that would have been claimed by the statutory merger's surviving entity, St. Luke's Hospital, in cost reporting periods subsequent to the statutory merger resulting from its continuing use of Allentown Osteopathic Medical Center's carrying values in the assets.

31.    By letter dated January 31, 2008, the CMS Office of the Attorney Advisor advised counsel for Allentown Osteopathic Medical Center that the CMS Administrator would review the PRRB's decision and determine whether that decision should be reversed, affirmed, modified or remanded. Allentown Osteopathic Medical Center was advised of its right to submit comments.

32.    By letter to the Attorney Advisor dated February 15, 2008, Allentown Osteopathic Medical Center requested that the CMS Administrator affirm the PRRB's decision recognizing the loss. However, Allentown Osteopathic Medical Center advised the Attorney Advisor that remand to the Intermediary was unnecessary because the Intermediary had

- 10 -

previously audited its loss calculation. Additionally, the PRRB's requirement that Allentown Osteopathic Medical Center's loss be reduced by depreciation allowances paid to the statutory merger's surviving entity in subsequent cost years was unprecedented, contrary to applicable Medicare payment authorities, and was beyond the PRRB's jurisdiction which was limited to matters covered by Allentown Osteopathic Medical Center's cost report for the period ended December 31, 1996. Allentown Osteopathic Medical Center indicated that if the Intermediary believed that its payment of depreciation costs in periods subsequent to the statutory merger were incorrect, Medicare reopening regulations provided the mechanism for a re-determination of the Medicare reimbursement due for the applicable cost reporting period.

33.    On March 24, 2008, the CMS Administrator reversed the PRRB's decision. A copy of the CMS Administrator's decision is attached as Attachment B. Relying on the Program Memorandum and the difference between the consideration received by Allentown Osteopathic Medical Center and the book value of its assets, the CMS Administrator found that the statutory merger was not a *bona fide* sale, as required for recognition of Allentown Osteopathic Medical Center's loss claim. The CMS Administrator stated that because the claimed loss was not allowable, it did not reach issues related to the loss calculation.

34.    The CMS Administrator's decision, received on March 28, 2008, constitutes the final administrative decision of the Secretary with respect to Allentown Osteopathic Medical Center's claim for reimbursement for its loss on statutory merger. Allentown Osteopathic Medical Center has exhausted its administrative remedies with respect to its claim.

35.    This Complaint is filed within sixty (60) days of receipt of the CMS Administrator's decision and is therefore timely. 42 U.S.C.A. § 1395oo(f)(1).

2008889v2

## COUNT I

36.    St. Luke's Hospital hereby incorporates by reference paragraphs 1 through 35 of this Complaint.

37.    Based upon the record developed before the PRRB and CMS Administrator in this case (hereinafter, "administrative record"), which will be certified by the CMS Administrator in accordance with 42 U.S.C. § 1395oo(f) and which is incorporated herein by reference, the Secretary's final administrative determination is contrary to the requirements of the Medicare statute because it fails to reimburse Allentown Osteopathic Medical Center for the loss in value of its depreciable assets, which is a cost actually incurred in providing covered services to Medicare beneficiaries, as required by 42 U.S.C. §§ 1395d(a), 1395f(b) and 1395x(v).

## COUNT II

38.    St. Luke's Hospital hereby incorporates by reference paragraphs 1 through 37 of this Complaint.

39.    Based upon the administrative record, the Secretary's final administrative determination is contrary to the requirements of the Medicare statute because it fails to reimburse Allentown Osteopathic Medical Center in accordance with regulations promulgated by the Secretary. 42 U.S.C. § 1395x(v)(1)(A).

## COUNT III

40.    St. Luke's Hospital hereby incorporates by reference paragraphs 1 through 39 of this Complaint.

41.    Based upon the administrative record, the Secretary's final administrative determination is contrary to the requirements of the Medicare statute because it fails to reimburse Allentown Osteopathic Medical Center's loss based on the applicable policies in effect on

June 1, 1984, which required recognition of Allentown Osteopathic Medical Center's loss claim. 42 U.S.C. § 1395x(v)(1)(O).

## COUNT IV

42.    St. Luke's Hospital hereby incorporates by reference paragraphs 1 through 41 of this Complaint.

43.    Based upon the administrative record, the Secretary's final administrative determination is contrary to the Secretary's governing regulation and long-standing interpretations, which require reimbursement of a provider's loss incurred on a statutory merger with an unrelated corporation. 42 C.F.R. § 413.134(l); Medicare Intermediary Manual § 4502.6.

## COUNT V

44.    St. Luke's Hospital hereby incorporates by reference paragraphs 1 through 43 of this Complaint.

45.    Based upon the administrative record, the Secretary's final administrative determination that the transaction was not a "*bona fide* sale," as required for recognition of the loss, because Allentown Osteopathic Medical Center did not receive reasonable consideration for its assets, which determination was based on the assets' book values, is arbitrary and capricious and unsupported by substantial evidence in the record as a whole within the meaning of the APA, 5 U.S.C. § 706(2)(A), (E). *See* 42 U.S.C. § 1395oo(f)(2).

## COUNT VI

46.    St. Luke's Hospital hereby incorporates by reference paragraphs 1 through 45 of this Complaint.

47.    Based upon the administrative record, the Secretary's final administrative determination is otherwise arbitrary, capricious, an abuse of discretion, otherwise not in

accordance with the law, and is unsupported by substantial evidence in the record as a whole within the meaning of the APA, 5 U.S.C. § 706(2)(A), (E). *See* 42 U.S.C. § 1395oo(f)(2).

### COUNT VII

48.    St. Luke's Hospital hereby incorporates by reference paragraphs 1 through 47 of this Complaint.

49.    Based upon the administrative record, the Secretary's final administrative determination violates the APA, 5 U.S.C. §§ 553, 706(D), because it reflects a substantive determination not expressed in any statute or regulation and which was contrary to the Secretary's previous regulatory interpretation, and which is void based on the Secretary's failure to comply with notice and comment rulemaking procedures. *See* 42 U.S.C. § 1395oo(f)(2).

### COUNT VIII

50.    St. Luke's Hospital hereby incorporates by reference paragraphs 1 through 49 of this Complaint.

51.    Based upon the administrative record, the Secretary's final administrative determination violates the Medicare statute, 42 U.S.C. § 1395hh(a) – (b), because it relies on a rule, requirement, or other policy statement changing a legal standard governing Medicare payment for services furnished to program beneficiaries that is void based on the Secretary's failure to comply with notice and comment rulemaking procedures.

### COUNT IX

52.    St. Luke's Hospital hereby incorporates by reference paragraphs 1 through 51 of this Complaint.

53.    Based upon the administrative record, the Secretary's final administrative determination violates the requirements of the APA, 5 U.S.C. § 552, because it relies on a

substantive rule or interpretation of general applicability or a statement of general policy that was not stated and published in the Federal Register.

## COUNT X

54.     St. Luke's Hospital hereby incorporates by reference paragraphs 1 through 53 of this Complaint.

55.     The Medicare statute requires the Secretary to publish a list of all manual instructions, interpretative rules, statements of policy, and guidelines of general applicability in the Federal Register at least every three months. *See* 42 U.S.C. § 1395hh(c)(1).

56.     The Bona Fide Sale Definition on which the Secretary relied was a manual instruction, interpretative rule, statement of policy, or guideline of general applicability.

57.     The Program Memorandum on which the Secretary relied (and which incorporated the Bona Fide Sale Definition) was an interpretative rule, statement of policy, or guideline of general applicability.

58.     Although the Bona Fide Sale Definition and Program Memorandum were issued in May 2000 and on October 20, 2000, respectively, neither was listed in the Federal Register until June 28, 2002. *See* "Medicare and Medicaid Programs; Quarterly Listing of Program Issuances – Fourth Quarter, 1999 through First Quarter, 2002." 67 Fed. Reg. 43,762, 43,776, 43,784 (June 28, 2002).

59.     Based upon the administrative record, the Secretary's final administrative determination violates the Medicare statute, 42 U.S.C. § 1395hh(c)(1), because it relies on a manual instruction, interpretative rule, statement of policy, or guideline of general applicability that was not timely listed in the Federal Register.

## COUNT XI

- 15 –

60.    St. Luke's Hospital hereby incorporates by reference paragraphs 1 through 59 of this Complaint.

61.    Based upon the administrative record, the Secretary's final administrative determination is prohibited retroactive rulemaking because it reflects application of rules adopted after Allentown Osteopathic Medical Center's loss was incurred, including a rule requiring that a statutory merger satisfy requirements for *bona fide* sales of assets, a definition of *bona fide* sale requiring reasonable consideration, and a regulatory amendment published on January 9, 1998, precluding recognition of gains or losses on transactions that occurred on or after December 1, 1997.  63 Fed. Reg. 1379, 1382 (Jan. 9, 1998).

COUNT XII

62.    St. Luke's Hospital hereby incorporates by reference paragraphs 1 through 61 of this Complaint.

63.    Based upon the administrative record, the Secretary's final administrative determination is contrary to the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, 1996 U.S.C.C.A.N. (110 Stat.) 847, 857, because it relies on a new rule which is void based on the Secretary's failure to adhere to procedures specified in that law. 5 U.S.C. § 801.  Before a rule can be put into effect, an agency must provide each House of Congress and the Comptroller General with a report, including a copy of the rule and related information.  A "major rule," such as that reflected in the Secretary's determination, cannot be put into effect earlier than sixty days after Congress receives the report, or the rule is published in the Federal Register.

COUNT XIII

64.    St. Luke's Hospital hereby incorporates by reference paragraphs 1 through 63 of this Complaint.

- 16 -

65.    Based upon the administrative record, the Secretary's final administrative retroactive determination constitutes an uncompensated taking of Allentown Osteopathic Medical Center's property without due process of law in violation of the Fifth Amendment of the United States Constitution.

## PRAYERS FOR RELIEF

WHEREFORE, St. Luke's Hospital, successor-in-interest to Allentown Osteopathic Medical Center, prays:

(a)    For an order reversing and setting aside the decision of the Secretary;

(b)    For an order declaring that St. Luke's Hospital, successor-in-interest to Allentown Osteopathic Medical Center, is entitled to $2,865,338 or such other amount of Medicare reimbursement determined to be due for the loss Allentown Osteopathic Medical Center incurred on its statutory merger with St. Luke's Hospital;

(c)    For an order remanding the case to the Secretary with directions that the loss on statutory merger incurred by Allentown Osteopathic Medical Center be reimbursed;

(d)    For interest on the amount in controversy in this appeal, as provided by 42 U.S.C. § 1395oo(f)(2);

(e)    For the costs of this suit incurred by St. Luke's Hospital, successor-in-interest to Allentown Osteopathic Medical Center; and

(f)    For such other and further relief as the Court may deem just and proper under the circumstances.

2008889v2

Respectfully submitted,

ST. LUKE'S HOSPITAL, successor-in-interest to ALLENTOWN OSTEOPATHIC MEDICAL CENTER

James P. Holloway (D.C. Bar # 415173)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
1401 H Street, N.W.
Washington, D.C. 20005-3324
(202) 408-8400

Leslie Demaree Goldsmith
(D.C. Bar # 422759)
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
(410) 685-1120

Plaintiff's Attorneys

OF COUNSEL:

Robert E. Mazer
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
(410) 685-1120

Dated at Washington, D.C.
this 23rd day of May, 2008

- 18 -

**Attachment A**

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

## 2008-D15

**PROVIDER –**
Allentown Osteopathic Medical Center
Allentown, PA

Provider No.: 39-0242

**vs.**

**INTERMEDIARY –**
BlueCross BlueShield Association/
Veritus Medicare Services (n/k/a
Highmark Medicare Services)

**DATES OF HEARINGS –**
January 18, 2007 and January 19, 2007

Cost Reporting Period Ended -
December 31, 1996

**CASE NO.:** 00-1182

## INDEX

| | Page No. |
|---|---|
| Issue........................................................................................... | 2 |
| Medicare Statutory and Regulatory Background............................................... | 2 |
| Statement of the Case and Procedural History................................................ | 3 |
| Stipulations of the Parties.................................................................. | 4 |
| Provider's Contentions..................................................................... | 4 |
| Intermediary's Contentions................................................................. | 8 |
| Findings of Fact, Conclusions of Law and Discussion........................................ | 8 |
| Decision and Order......................................................................... | 11 |

Attachment A

Page 2                                                              CN.: 00-1182

ISSUE:

Whether the Intermediary's denial of the loss on disposal of assets claimed by Allentown Osteopathic Medical Center (AOMC) was proper?

## MEDICARE STATUTORY AND REGULATORY BACKGROUND:

The Medicare program was established to provide health insurance to the aged and disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA) is the operating component of the Department of Health and Human Services (DHHS) charged with administering the Medicare program. CMS' payment and audit functions under the Medicare program are contracted out to insurance companies known as fiscal intermediaries. Fiscal intermediaries determine payment amounts due the providers under Medicare law and under interpretive guidelines published by CMS. See, 42 U.S.C. §1395h, 42 C.F.R. §§413.20(b) and 413.24(b)

At the close of its fiscal year, a provider must submit a cost report to the fiscal intermediary showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. §413.20. The fiscal intermediary reviews the cost report, determines the total amount of Medicare reimbursement due the provider and issues the provider a Notice of Program Reimbursement (NPR). 42 C.F.R. §405.1803. A provider dissatisfied with the intermediary's final determination of total reimbursement may file an appeal with the Provider Reimbursement Review Board (Board) within 180 days of the issuance of the NPR. 42 U.S.C. §1395oo(a); 42 C.F.R. §405.1835.

Under the Social Security Act (Act) in effect during the year in issue, a provider was entitled to claim as a reimbursable cost the depreciation (i.e., the loss of value overtime) of property, plant and equipment used to provide health care to Medicare patients. An asset's depreciable value is initially set at its "historical cost," generally equal to the purchase price. 42 C.F.R. §413.134(b)(1). To determine annual depreciation, the historical cost is then prorated over the asset's estimated useful life in accordance with an acceptable depreciation method. 42 C.F.R. §413.134(a)(3). Providers were then reimbursed on an annual basis for a percentage of the yearly depreciation equal to the percentage the asset was used for the care of Medicare patients.[1]

Because the calculated annual depreciation was only an estimate of the asset's declining value, the regulation at 42 C.F.R. §413.134(f) provided for the determination of a depreciation adjustment where a provider incurred a gain or loss on the disposition of a depreciable asset.[2] If an asset was disposed of for less than the depreciated basis calculated under Medicare (net book value), then a "loss" had occurred because the

---

[1] The Medicare Act has been amended to change the method of payment for capital assets.

[2] A depreciation adjustment for a gain or loss was removed from the program's regulations effective December 1, 1997.

Page 3                                                                CN.: 00-1182

consideration received for the asset was less than the estimated remaining value. In the event of a loss, the Medicare program assumed that more depreciation occurred than was originally estimated, and the provider received additional reimbursement in the form of a depreciation adjustment. Conversely, if a provider received consideration for a disposed asset that would greater than the depreciated basis, then a "gain" had occurred, and the Medicare program recaptured its share of previously reimbursed depreciation paid to the provider.

In 1979, CMS extended the depreciation adjustment to "complex financial transactions" not previously addressed in 42 C.F.R. §413.134(f) by including mergers and consolidations. A statutory merger between <u>unrelated</u> parties was treated as a sale of assets that would trigger: (I) the revaluation of assets in accordance with 42 C.F.R. §413.134(g), and (2) the realization of gains and losses under the provisions of 42 C.F.R. §413.134(f). However, a statutory merger between <u>related</u> parties would not trigger a depreciation adjustment.

Medicare's rules regarding "relatedness," 42 C.F.R. §413.17, state in pertinent part:

> (b) *Definitions.* (1) *Related to the provider*. Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.

> (2) *Common Ownership*. Common ownership exists if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.

> (3) *Control*. Control exists if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.

## STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

Allentown Osteopathic Medical Center (AOMC) was a non-profit, general acute care hospital located in Allentown, Pennsylvania. Effective January 1, 1997, the Provider merged into an unrelated entity, St. Luke's Hospital (St. Luke's). The Provider submitted its final Medicare cost report for the period ended December 31, 1996, on which it claimed a loss on statutory merger.

Upon audit of the Provider's cost report, Veritus Medicare Services (Intermediary) disallowed the loss claiming that the statutory merger from which the loss arose did not meet the requirements of a bona fide sale.

Page 4                                                                CN.: 00-1182

The disallowance of the loss was reflected in a NPR dated August 6, 1999.[3] On January 21, 2000, the Provider timely filed its request for hearing with the Board pursuant to 42 C.F.R. §§405.1835-1841 challenging the disallowance of the loss claim. The Provider met the jurisdictional requirements set forth in those regulations. The amount of Medicare program funds in controversy is approximately $2.9 million.[4] The Provider was represented by Leslie Demaree Goldsmith, Esquire, of Ober Kaler, Grimes & Shriver. The Intermediary was represented by Bernard M. Talbert, Esquire of Blue Cross Blue Shield Association.

STIPULATIONS OF THE PARTIES:

The parties have stipulated that the merger of the Provider into St. Luke's was a statutory merger under Pennsylvania law and Medicare regulations. As a result good title to all of the Provider's assets passed by operation of law to St. Luke's. St. Luke's became legally responsible for all of the Provider's debts and liabilities, both known and unknown. The statutory merger was a bona fide transaction and complied with all applicable legal and regulatory requirements, and the transaction was not between related parties.[5]

PROVIDER'S CONTENTIONS:

**Market Conditions**

The Lehigh Valley market place in the early 1990's became increasingly competitive with the growth of managed care and the development of health systems. As a small community osteopathic hospital in the Lehigh Valley, the Provider was excluded from managed care contracts, and doctors could not send their patients to the Provider because the managed care plans refused to pay for hospital services furnished by the Provider.[6]

The Provider had a 9.16% decline in its admissions from 1993 to 1995.[7] In 1995, it had the smallest share of the market for hospital services. The Provider had occupancy rates of 48.6% and 42.3% of its licensed beds in 1995 and 1996,[8] respectively, as compared to other Pennsylvania Region 7 hospitals of similar size that experienced occupancy rates of 66.1% and 64.0%[9] during the same periods. As a result, the Provider was experiencing losses of about $1 million a year.[10] In its fiscal year ended June 30, 1996, the last full fiscal year prior to the merger, the Provider lost $1.3 million.[11]

---

[3] See, Intermediary Exhibit I-4
[4] See, Provider Exhibit P-93, p. 5.
[5] See, Provider Exhibit P-96.
[6] Transcript (Tr.) at 64-65.
[7] Tr. at 85-87; Exhibit P-71.
[8] See, Provider Exhibit P-74, p.85
[9] See, Provider's Post Hearing Brief at 2.
[10] Tr. at 101.
[11] Tr. at 102-03; Provider Exhibit P-15.

Page 5                                                        CN.: 00-1182

## Condition of Physical Plant

Two of the buildings at the Provider comprising the hospital exceeded 25-30 years of age. Because there had been a plan to relocate the hospital, adequate money had not been reinvested into the physical plant, and the majority of the buildings and programs required substantial improvements.[12] The mechanical, electrical and plumbing systems needed replacement.[13] The facility had significant violations of the building code, the most significant of which was the sprinkler system, for which the Provider was granted an extension for a period of time.[14] An upgrade to the telephone system and computer systems was also required.[15] Asbestos was known to exist in the West Wing, and was subsequently found in other parts of the complex.[16] The buildings also were not in compliance with the Americans With Disabilities Act (ADA). Although the buildings were grandfathered, i.e., deemed not in violation because they pre-dated the ADA, any significant renovations or new construction required for the hospital's long-term survival would result in the buildings having to comply with ADA requirements and with current building codes.[17]

## Provider's Strategic Plan

The Provider began its strategic planning process in 1993 by engaging KPMG, Peat Marwick to evaluate whether the Provider could afford to borrow sufficient funds to build a brand new hospital at a suburban site and to evaluate other alternatives. KPMG's evaluation was that the Provider could not carry the debt necessary to build a new hospital.[18] Subsequently, the Provider engaged Chi Systems, Inc. (Chi) to assist it in strategic planning. Chi presented a report to the Board of Directors in February 1995 identifying five "strategic imperatives" for the Provider. These imperatives were:

1. To affiliate with a leading health care delivery system in Lehigh Valley.
2. To obtain sufficient capital to address resource needs for medical staff, facility upgrades, information systems and program development.
3. To support medical staff development and promote greater physician-hospital integration.
4. To become well-positioned for managed care contracting.
5. To review, enhance and modify existing programs and expand non-acute services.[19]

The report concluded that retaining independence was not a viable option, and that to gain access to the necessary capital needed to address the facility's needs, the Provider needed a tight affiliation with another entity.[20]

---

[12] Tr. at 197-200, 203.
[13] Tr. at 203; Provider Exhibits P-6, pp. 23-24, P-73, p. 13.
[14] Tr. at 242-43.
[15] Tr. at 218-24; Provider Exhibits P-3, p. 5, P-9.
[16] Tr. at 204; Provider Exhibits P-73, p. 14.
[17] Tr. at 205-07; Provider Exhibit P-73, p. 14.
[18] Tr. at 59-62.
[19] Tr. at 62-70; Provider Exhibit P-3.

CN.: 00-1182

In response, the Provider's Board established an Affiliation Task Force and began the process of examining potential affiliation partners. The Provider was willing to engage in conversations with any interested party,[21] agreed to supply other hospitals with financial information,[22] and engaged KPMG to assist in negotiations with potential partners.[23] The Provider first explored an alliance with the Hospital of the University of Pennsylvania (HUP), but HUP was not interested.[24] The Provider then investigated affiliations with the obvious choices of Sacred Heart Hospital, Lehigh Valley Hospital and St. Luke's Hospital,[25] as well as with Graduate Health System and Alleghany System.[26] Meetings were held with all five of these entities. All of these were non-profit entities, as there were no for-profit health systems in Pennsylvania at that time with which the Provider could investigate an affiliation or other transaction.[27]

Complicating the search for an affiliation partner was the fact that the Provider's medical staff had "veto power" over any corporate restructuring.[28] The medical staff wanted to continue to provide acute care at the existing facility and, as long as that alternative was a possibility, it would not have approved anything less than an entity coming in with substantial capital to keep the Provider operating as an acute care hospital.[29]

On December 11, 1995, the Provider's governing board agreed to begin negotiations with St. Luke's. St. Luke's was chosen for several reasons. It was one of only two of the five possible partners that was willing to invest in upgrading AOMC's facilities. Of those two, St. Luke's was the only local system and was very strong. In addition, St. Luke's had an interest in merging with the Provider because St. Luke's needed a foothold in the Allentown market.[30] St. Luke's, thus, was the entity with which the Provider could strike the best deal.[31]

The Provider entered into a Merger Agreement with St. Luke's dated October 16, 1996.[32] Under its terms, the Provider would merge into, and become part of, St. Luke's. St. Luke's agreed to maintain and operate acute inpatient services at the Provider's campus for a minimum of two years after the merger, unless an operating loss of $75,000 or more per month for six months, or a cumulative loss of $500,000 for any rolling six-month period, was incurred. After the two-year period, inpatient services would continue unless a cumulative operating surplus, on the six-month rolling basis, was not maintained. In addition, St. Luke's agreed to invest in the Provider's campus plant, equipment, programs

---

[20] Id.
[21] Tr. at 81; Provider Exhibit P-4, p. 14.
[22] Tr. at 81; Provider Exhibit P-4, p. 16.
[23] Tr. at 83-84.
[24] Tr. at 76-77.
[25] Tr. at 77-80.
[26] Tr. at 83.
[27] Tr. at 100, 114.
[28] Tr. at 73-74, 98-100; Provider Exhibits P-4, p. 4, P-70, p. 3.
[29] Tr. at 99.
[30] Tr. at 94-97.
[31] Tr. at 97-98.
[32] See, Provider Exhibit P-1.

CN.: 00-1182

and services, although it would not agree to a specific amount.[33]  St. Luke's would
continue to recognize osteopathic medical philosophy, training programs and
accreditations. The Provider's Board of Trustees would serve as an "other body" under
Pennsylvania Law, in an advisory capacity.[34]

The merger was effective on January 1, 1997.[35]  On that date, the Provider merged into
St. Luke's and ceased to exist as a separate entity.

**Recognition of the Loss**

The Provider contends that the requirements for recognition of a loss on statutory merger
have been satisfied.  The transaction on which the Provider incurred a loss was a statutory
merger between unrelated parties, requiring recognition of the loss.  The parties have
stipulated that, prior to the transaction, AOMC and St. Luke's were not subject to
common control or common ownership, and that following the merger, St. Luke's,
including the assets formerly owned by AOMC, was not subject to the control or
significant influence of any individual(s) or organization that had been able to control or
significantly influence AOMC prior to the merger.  Neither side had control or influence
over the other prior to the date of the merger.

The Medicare regulations require that a gain or loss be recognized when, as here, a
statutory merger takes place between unrelated corporations. CHOW Manual §4502.1(c)
defines "corporation" to include both proprietary and non-stock entities.[36]

The disallowance of the Provider's loss cannot be sustained based on the Intermediary's
determination that consideration was unreasonable.  Since the loss resulted from a
statutory merger, the requirements related to purchase and sale of assets are irrelevant to
recognition of that loss.  The Intermediary must bear the burden of demonstrating that
bona fide sale requirements are applicable, and that those requirements were not satisfied.
The Intermediary has not satisfied that burden.

All testimony established that a statutory merger is fundamentally different from a sale of
assets – bona fide or otherwise.[37]  Accordingly, the Intermediary applied bona fide sale
requirements to a different type of transaction.  As of the date of the loss and the audit
determination, there was no Medicare policy that required statutory mergers between
unrelated entities to satisfy the requirements for a bona fide sale.[38]

The Provider contends that its calculation of the loss at Exhibit P-93, p. 5 of which
Medicare's share is $2,865,338, should be accepted. This was calculated by allocating
the consideration (liabilities assumed) among all the assets transferred, using the

---

[33] Tr. at 119-21.
[34] Tr. at 186-88.
[35] See, Provider Exhibit P-17.
[36] See, Exhibit P-77.
[37] Tr. at 162-64.
[38] Tr. at 353-54; Tr.

"proportionate allocation" methodology, under which the consideration is allocated proportionately among all assets that were transferred based on the net book value of the assets.

## INTERMEDIARY'S CONTENTIONS:

The Intermediary contends that its position is supported by the CMS Administrator's reviews of past Board decisions and reinforced by recent Federal District Court decisions. The Intermediary argues that:

- The purpose of recognizing a loss (or gain) on disposition of depreciable assets is to correct the depreciation estimate and recognize the true cost to the Medicare program of the use of depreciable assets in caring for Medicare beneficiaries.

- The only transaction that corrects the depreciation within the regulations at 42 C.F.R. §413.134 is a bona fide sale under 42 C.F.R. §413.134(f)(2).

- A transfer of assets through the execution of a statutory merger may have the bona fide sale behavior objectives in which the negotiations produce a reasonable determination of the fair market value of the assets sold. On the other hand, a merger deal may be done for "bona fide" reasons, but a sale between a buyer and seller is the opposite of the participant's objective.

- Providers that have claimed losses on mergers or consolidation have argued that identification of the transaction as a statutory merger or a consolidation between unrelated parties ends the discussion and a loss is reimbursed. Determining the loss is then a function of a formulistic debate over how to allocate the liabilities transferred in the merger to all the assets transferred. The more solvent the merging party, the larger the loss.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:

After considering the Medicare laws and guidelines, the evidence presented, and the parties' contentions, the Board finds and concludes as follows. The parties have stipulated that the Provider, AOMC and St. Luke's were unrelated parties as that term is defined in the regulatory provisions of 42 C.F.R. §413.17. Accordingly, the Board finds that a revaluation of the assets and a recognition of the loss incurred as a result of the merger of these unrelated parties is required under the specific and plain meaning of 42 C.F.R. §413.134(l)(2)(i).

The parties agree that the transaction at issue was a statutory merger under Pennsylvania law, and that 42 C.F.R. §413.134, *Depreciation: Allowance for depreciation based on asset costs*, is applicable. Section 413.134(l)(2) defines a statutory merger as "a combination of two or more corporations under the corporation laws of the State, with one of the corporations surviving." It is undisputed that the Provider merged into St. Luke's and ceased to exist. Under the terms of the transaction, St. Luke's (the surviving

corporation) acquired all the assets and assumed all the liabilities associated with the operations of the Provider.

Under regulations set forth at 42 C.F.R. §413.134(l)(2), the effect of a statutory merger upon Medicare reimbursement is as follows:

> (i)   *Statutory merger between unrelated parties*. If the statutory
>        merger is between two or more corporations that are unrelated
>        (as specified in §413.17), the assets of the merged
>        corporation(s) acquired by the surviving corporation may be
>        revalued in accordance with paragraph (g) of this section. If
>        the merged corporation was a provider before the merger, then
>        it is subject to the provisions of paragraphs (d)(3) and (f) of
>        this section concerning recovery of accelerated depreciation
>        and the realization of gains and losses. . . .

The Board finds the plain language of the statutory merger regulation dispositive. The text at 42 C.F.R. §413.134(l)(2)(i), which states, "if the statutory merger is between two or more corporations that are unrelated. . ." is unambiguous in its meaning that the related party concept will be applied to the entities that are merging as they existed <u>prior</u> to the transaction.

The Board finds that because there is a specific regulation that controls the recognition of a loss on the merger transaction at issue in this case, 42 C.F.R. §413.134(l), the merger is not required to meet the <u>bona</u> <u>fides</u> of sales transactions addressed in 42 C.F.R. §413.134(f)(2). The Board is aware that a subsection of the regulation on mergers refers to capital stock and may be interpreted as applying only to stock transactions. However, CMS has interpreted the regulation to apply to non-profit transactions as well. CMS' Director of the Division of Payment and Reporting Policy, Office of Reimbursement Policy, stated in a 1987 letter that the regulation applied to non-profits. In addition, the October 2000 "Clarification of the Application of the Regulations at 42 C.F.R. §413.134(1) to Mergers and Consolidations Involving Non-profit Providers," CMS Program Memorandum, Transmittal A-00-76, states that the regulation applies to non-profits; however, it asserts that "special considerations" apply.

The Provider and Intermediary agreed that if the Board allowed the loss, the loss calculation should be based upon the proportionate allocation methodology prescribed by 42 C.F.R. §413.134(f)(2)(iv). Pursuant to this methodology, the consideration at issue is allocated among all the assets acquired based upon the relationship of each individual asset's fair market value to the total fair market value of all of the assets in the aggregate.

The Board concludes that evidence of a changing healthcare environment and lack of a market for provider facilities is persuasive that the Provider incurred a genuine financial loss. That evidence also supports the Provider's position that the process of finding a suitable merger partner requires arm's length evaluation and bargaining similar to that in a traditional sale, although the Board believes it may be more imprecise in producing fair

market value. The Medicare Manual supports this view. HCFA Pub. 13-4 §4508.11 incorporates as part of the Manual, Accounting Board Opinion No. 16, "Business Combinations." "Medicare program policy places reliance on the generally accepted accounting principles as expressed in . . . APB No. 16 in the revaluation of assets and gain/loss computation processes for Medicare reimbursement purposes."[39] APB No. 16 contains a comprehensive discussion of the advantages and disadvantages and the practical difficulties of treating a combination as a purchase. Paragraph 19, entitled "A bargained transaction," states that proponents of the purchase method recognize a business combination as " . . . a significant economic event that results from bargaining between independent parties. Each party bargains on the basis of his assessment of the current status and future prospects of each constituent as a separate enterprise and as a contributor to the proposed combined enterprise. The agreed terms of combination recognize primarily the bargained values and only secondarily the costs of assets and liabilities carried by the constituents . . ."   The Board concludes that the assumption of liabilities through a merger transaction is persuasive evidence of acquisition costs.[40] Liabilities assumed in a merger also may, but do not necessarily, equate to fair market value.

The Board finds that the "Booth pro-rata method," calculated by the Provider, requires review and audit by the Intermediary. The Board, therefore, remands this case to the Intermediary to perform the necessary audit procedures to ensure the accuracy and appropriateness of the loss calculation to include a review of the documentation related to the $177,984 liability due to St. Luke's –Bethlehem/Quakerstown that was excluded from the consideration. See page 27 of the Provider's post-hearing brief for a description. The explanation is insufficient to determine if the liabilities addressed should have been considered part of the consideration used in the loss calculation. The Board also requires the Intermediary to determine the Provider's actual Medicare utilization that should be used to determine Medicare's share of the loss.

In computing the Provider's loss, the Board finds, as it has in similar cases, that the amount of the allowable loss should be reduced by the depreciation expense that would have been claimed on the merged assets by the surviving corporation. This adjustment, commonly referred to as the "DEFRA adjustment," is necessary because the merger transaction was treated as a pooling of interests for accounting purposes, and the value of the assets transferred to St. Luke's in the merger was not written down. As a result, St. Luke's continued to claim depreciation for these assets at their carrying value on the Provider's books at the date of the transaction without considering the decline in their value as evidenced by the loss.

The Provider argues in its footnote 17 on page 27 of its Post-Hearing Brief that while it agrees that the DEFRA adjustment is appropriate if the loss is allowed, the years to which

---

[39] The Manual cautions, though, that in certain areas, Medicare policy deviates from that in generally accepted accounting principles.

[40] Acceptance of the amount of liabilities assumed as the acquisition cost is the position taken by HCFA's Director of the Division of Payment and reporting Policy, Office of Reimbursement Policy, in a 1987 letter. Provider Supplemental Exhibit D.

Page 11                                                         CN.: 00-1182

the adjustment would be applied are after the year in issue and, therefore, are not before the Board. Consequently, the Board may not properly reduce the loss on statutory merger incurred by (the Provider) during the fiscal year ended December 31, 1996 by any excess depreciation that St. Luke's may have received in subsequent years."[41]  The Board disagrees, and finds authority for its decision to require the DEFRA adjustment in Bethesda Hospital Association v. Bowen, 108 S. Ct. 1255 (1988), where the U.S. Supreme Court held that the Board may go beyond issues directly before it if the Board deems it necessary.  The Board finds that commensurate with allowance of the loss, the DEFRA adjustment must also be made in order to prevent the Medicare program from paying excess depreciation cost.

DECISION AND ORDER:

The Provider's claimed loss on disposal of depreciable assets as a result of the merger is allowable under 42 C.F.R. §413.134(l)(2)(i) subject to the Intermediary review and audit of the Provider's "Booth method" allocation of consideration relating to the merger and the application of the DEFRA adjustment.  The Intermediary's denial of the loss resulting from the merger is reversed.

BOARD MEMBERS PARTICPATING:

Suzanne Cochran, Esquire
Elaine Crews Powell, CPA
Anjali Mulchandani-West, CPA
Yvette C. Hayes

FOR THE BOARD:

Suzanne Cochran
Chairperson

DATE:   JAN 2 4 2008

----

[41] See, Provider Post Hearing Brief at 27.

Enclosure

## Final Decision Review and Appeal Information

The Provider Reimbursement Review Board's (Board) decision
becomes final 60 days after the date of receipt by the provider
unless within that time the Administrator of HCFA notifies the
parties of an action taken under the provisions of 42 C.F.R.
§ 405.1875. If such action is taken, then the Administrator's
decision becomes final 60 days after receipt thereof by the
provider.

Providers are permitted to initiate two actions within specified
time limits. First, the provider (and/or the intermediary) may
request the Administrator to review a Board decision within 15
days of its receipt. (See § 405.1875(b)). Secondly, Section
1878(f) of the Social Security Act ("Act"), 42 U.S.C.
§ 1395oo(f), permits a provider to obtain judicial review of a
final decision of either the Board or the Administrator by filing
a civil action within 60 days of the date on which the provider
receives such decision. (See also 42 C.F.R. § 405.1877). For
your convenience, a copy of each of the above-referenced
authorities is enclosed.

Enclosures

## § 405.1875 Administrator's review.

(a) *General rule.* (1) Except for a Board determination under § 405.1842 that it lacks the authority to decide an issue, the Administrator, at his or her discretion, may review any final decision of the Board, including a decision under § 405.1873 about the Board's jurisdiction to grant a hearing. The Administrator may exercise this discretion on his or her own motion, in response to a request from a party to a Board hearing or in response to a request from HCFA.

(2) The Office of the Attorney Advisory will examine the Board's decisions, the requests made by a party or HCFA and any submission made in accordance with the provisions of this section in order to assist the Administrator in deciding whether to exercise this review authority.

(b) *Request for review.* A party or HCFA requesting the Administrator to review a Board decision must file a written request with the Administrator within 15 days of the receipt of the Board decision.

(c) *Criteria for deciding whether to review.* In deciding whether to review a Board decision, either on his or her own motion or in response to a request from a party to the hearing or HCFA, the Administrator will normally consider whether it appears that:

(1) The Board made an erroneous interpretation of law, regulation or HCFA Ruling;

(2) The Board's decision is not supported by substantial evidence; or

(3) The case presents a significant policy issue having a basis in law and regulations, and review is likely to lead to the issuance of a HCFA Ruling or other directive needed to clarify a statutory or regulatory provision;

(4) The Board has incorrectly assumed or denied jurisdiction or extended its authority to a degree not provided for by statute, regulation or HCFA Ruling; and

(5) The decision of the Board requires clarification, amplification, or an alternative legal basis for the decision.

(d) *Decision to review.* (1) Whether or not a party or HCFA has requested review, the Administrator will promptly notify the parties and HCFA whether he or she has decided to review a decision of the Board and, if so, will indicate the particular issues he or she will consider.

(2) The Administrator may decline to review a case or any issue in a case even if a party has filed a written request for review under paragraph (b) of this section.

(e) *Written submissions.* (1) Within 15 days of receipt of a notice that the Administrator has decided to review a Board decision, a party or HCFA may submit to the Administrator, in writing:

(i) Proposed findings and conclusions;

(ii) Supporting views or exceptions to the Board decision;

(iii) Supporting reasons for the exceptions and proposed findings; and

(iv) A rebuttal of the other party's request for review or other submissions already filed with the Administrator.

(2) These submissions shall be limited to issues the Administrator has decided to review and confined to the record of the Board hearing.

(3) A party or HCFA, within 15 days of receipt of a notice that the Administrator has decided to review a decision, may also request that the decision be remanded and state reasons for doing so. Reasons for a request to remand may include new, substantial evidence concerning—

(i) Issues presented to the Board; and

(ii) New issues that have arisen since the case was presented to the Board.

(4) A copy of any written submission made under this paragraph shall be sent simultaneously to each other party to the Board hearing and to HCFA, if HCFA has previously—

(i) Requested that the Administrator review a Board decision or filed a written submission in response to a party's request for review.

(ii) Responded to a party's request for review; or

(iii) Submitted material after the Administrator has announced that he or she will review a Board decision.

(f) *Ex parte communications prohibited.* All communications from any of the parties or HCFA about a Board decision being reviewed by the Administrator must be in writing and must contain a certification that copies have been served on the parties and HCFA, as appropriate. The Administrator will not consider any communication that does not meet these requirements or is not submitted within the required time limits.

(g) *Administrator's decision.* (1) If the Administrator has notified the parties and HCFA that he or she has decided to review a Board decision, the Administrator will affirm, reverse, modify or remand the case.

(2) The Administrator will make this decision within 60 days after the provider received notification of the Board decision and will promptly mail a copy of the decision to each party and to HCFA.

(3) Any decision other than to remand will be confined to—

(i) The record of the Board, as forwarded by the Board;

(ii) Any materials submitted under paragraphs (b) or (e) of this section; and

(iii) Generally known facts that are not subject to reasonable dispute.

(4) The Administrator may rely on prior decisions of the Board, the Administrator and the courts, and other applicable law, whether or not cited by the parties and HCFA.

(h) *Remand.* (1) A remand to the Board by the Administrator vacates the Board's decision.

(2) The Administrator may direct the Board to take further action with respect to the development of additional facts or new issues, or to consider the applicability of laws or regulations other than those considered by the Board. The following are not acceptable bases for remand—

(i) Presentation of evidence existing at the time of the Board hearing that was known or reasonably could have been known;

(ii) Introduction of a favorable court case that was either not available in print at the time of the Board hearing or was decided after the Board hearing;

(iii) Change of a party's representation before the Board;

(iv) Presentation of an alternative legal basis concerning an issue in dispute; or

(v) Attempted retraction of a waiver of a right made before or at the Board hearing.

(3) After remand, the Board will take the action requested in the remand action and issue a new decision.

(4) The new decision will be final unless the Administrator reverses, affirms, modifies, or again remands the decision in accordance with the provisions of the section.

[48 FR 45773, Oct. 7, 1983]

## THE SOCIAL SECURITY ACT AS AMENDED - TITLE XVIII

### Section 1878(f)(1) Judicial Review

(f)(1) A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision. Providers shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received. Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines (on its own motion or at the request of a provider of services as described in the following sentence) that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of such determination is received. If a provider of services may obtain a hearing under subsection (a) and has filed a request for such a hearing, such provider may file a request for a determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy (accompanied by such documents and materials as the Board shall require for purposes of rendering such determination). The Board shall render such determination in writing within thirty days after the Board receives the request and such accompanying documents and materials, and the determination shall be considered a final decision and not subject to review by the Secretary. If the Board fails to render such determination within such period, the provider may bring a civil action (within sixty days of the end of such period) with respect to the matter in controversy contained in such request for a hearing. Such action shall be brought in the district court of the United States for the judicial district in which the provider is located (or, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia and shall be tried pursuant to the applicable provisions under chapter 7 of title 5, United States Code, notwithstanding any other provisions in section 205. Any appeal to the Board or action for judicial review by providers which are under common ownership or control or which have obtained a hearing under subsection (b) must be brought by such providers as a group with respect to any matter involving an issue common to such providers.

**§ 405.1877  Judicial review.**

(a) *General rule.* Section 1878(f) of the Act permits a provider to obtain judicial review of a final decision of the Board, or of a reversal, affirmation, or modification by the Administrator of a Board decision, by filing a civil action pursuant to the Federal Rules of Civil Procedure within 60 days of the date on which the provider received notice of—

(1) A final decision by the Board; or

(2) Any reversal, affirmance, or modification by the Administrator.

The Board's decision is not final if the Administrator reverses, affirms or modifies the decision within 60 days of the date on which the provider received notice of the decision.

(b) *Administrator declines to review a Board decision.* If the Administrator declines to review a Board decision, the provider must file its appeal within 60 days of receipt of the decision of the Board.

(c) *Administrator does not act after reviewing a Board decision.* If the Administrator notifies the parties that he or she has decided to review a Board decision and then does not make a decision within the 60 days allotted for his or her review, this subsequent inaction constitutes an affirmance allowing a provider an additional 60 days in which to file for judicial review, beginning with the date the Administrator's time expires for taking action under § 405.1875(g)(2).

(d) *Matters not subject to judicial review.* Certain matters affecting payments to hospital under the prospective payment system are not subject to judicial review, as provided in section 1886(d)(7) of the Act and § 405.1804.

(e) *Group appeals.* Any action under this section by providers that are under common ownership or control (see § 413.17 of this chapter) must be brought by the providers as a group with respect to any matter involving an issue common to the providers.

(f) *Venue for appeals.* An action for judicial review must be brought in the District Court of the United States for the judicial district in which the provider is located (or, effective April 20, 1983, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia. Effective April 20, 1983, any action for judicial review by providers under common ownership or control (§ 413.17 of this chapter), must be brought by such providers as a group with respect to any matter involving an issue common to the providers.

(g) *Service of process.* Process must be served as described under 45 CFR part 4.

[48 FR 39836, Sept. 1, 1983, as amended at 48 FR 45774, Oct. 7, 1983; 51 FR 34793, Sept. 30, 1986]

(a)  General rule
Section 1878(f) of the Act permits a provider to obtain judicial review of a final decision of the Board, or of a reversal, affirmation, or modification by the Administrator of a Board decision, by filing a civil action pursuant to the Federal Rules of Civil Procedure within 60 days of the date on which the provider received notice of--
(1)  A final decision by the Board; or
(2)  Any reversal, affirmance, or modification by the Administrator.
The Board's decision is not final if the Administrator reverses, affirms or modifies the decision within 60 days of the date on which the provider received notice of the decision.

(b)  Administrator declines to review a Board decision
If the Administrator declines to review a Board decision, the provider must file its appeal within 60 days of receipt of the decision of the Board.

(c)  Administrator does not act after reviewing a Board decision
If the Administrator notifies the parties that he or she has decided to review a Board decision and then does not make a decision within the 60 days allotted for his or her review, this subsequent inaction constitutes an affirmance allowing a provider an additional 60 days in which to file for judicial review, beginning with the date the Administrator's time expires for taking action under Section 405.1875(g)(2).

(d)  Matters not subject to judicial review
Certain matters affecting payments to hospital under the prospective payment system are not subject to judicial review, as provided in Section 1886(d)(7) of the Act and Section 405.1804.

(e)  Group appeals
Any action under this section by providers that are under common ownership or control (see Section 405.427) must be brought by the providers as a group with respect to any matter involving an issue common to the providers.

(f)  Venue for appeals
An action for judicial review must be brought in the District Court of the United States for the judicial district in which the provider is located (or, effective April 20, 1983, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia. Effective April 20, 1983, any action for judicial review by providers under common ownership or control (Section 405.427), must be brought by such providers as a group with respect to any matter involving an issue common to the providers.

(g)  Service of process
Process must be served as described under 45 CFR Part 4.

(41 FR 52051, Nov. 26, 1976. Redesignated at 42 FR 52826, Sept. 30, 1977 amended at 48 FR 39836, Sept. 1, 1983; 48 FR 45774, Oct. 7, 1983)

**Attachment B**

## CENTERS FOR MEDICARE AND MEDICAID SERVICES

*Decision of the Administrator*

| | |
|---|---|
| **In the case of:** | **Claim for:** |
| **Allentown Osteopathic Medical Center** | **Provider Cost Reimbursement Determination for Cost Reporting Period Ending: 12/31/96** |
| Provider | |
| vs. | |
| **Blue Cross Blue Shield Association/ Vertius Medicare Services (n/k/a Highmark Medicare Services)** | **Review of:** **PRRB Dec. No. 2008-D15** **Dated: January 24, 2008** |
| **Intermediary** | |

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in § 1878(f) (1) of the Social Security Act (Act), as amended (42 USC 1395oo (f)). Accordingly, the parties were notified of the Administrator's intention to review the Board's decision. The Center for Medicare Management (CMM) submitted comments, requesting reversal of the Board's decision. The Provider also submitted comments, requesting that the Administrator affirm. Accordingly, this case is now before the Administrator for final agency review.

### BACKGROUND

On October 16, 1996, a Merger Agreement (Agreement) was entered into between the Provider and St. Luke's Hospital (St. Luke's).[1] Under the terms of the agreement, effective January 1, 1997. the Provider was merged into St. Luke's with the latter as the surviving entity. St. Luke's also agreed to maintain and operate an acute inpatient services hospital at the Provider's campus for a minimum of two years after the merger, unless an operating loss of $75,000 or more per month for six months, or a cumulative loss of $500,000 for any rolling six-month period was incurred.[2] After the two-year period, inpatient services would continue, unless a

---

[1] Provider's Exhibit P-1.

[2] Id., p. 3 § 2.4 et seq.

cumulative operating surplus, on the six-month rolling basis, was not maintained. In addition, St. Luke's agreed to invest in the Provider's campus plant, equipment, programs, and services. St. Luke's would also continue to recognize osteopathic medical philosophy, training programs and accreditations.[3] The Provider's Board of Trustees would also serve as an "other body" under Pennsylvania Law, in an advisory capacity.[4]

As a result of the transaction, the assets and liabilities of the Provider were transferred to St. Luke's Hospital.[5] The consideration incurred by St. Luke's was determined to be the assumption of debt in the amount of $4,848,188.[6] Upon audit of the Provider's cost report for fiscal year ending December 31, 1996, the Intermediary disallowed the loss claimed by the Provider.

## ISSUE AND BOARD'S DECISION

The issue is whether the Intermediary's adjustment, disallowing the loss claimed by Provider, was proper.[7]

The Board held that the Provider was entitled to claim a loss on disposal of depreciable assets as a result of the statutory merger of the Provider and St. Luke's under 42 C.F.R. § 413.134(l)(2)(i). The Board determined that, since there was a

---

[3] Id., p.4 § 2.8.
[4] Id., p. 2 § 2.1 et seq; Transcript of Oral Hearing (Tr) at 186-88.
[5] Provider's Exhibit P-1, P-17.
[6] Provider's Exhibit P-93.

| Allocated Consideration Liabilities | |
|---|---|
| Current Portion of Long Term Debt | $ 656,925 |
| Accounts Payable | $ 439,519 |
| Estimated Third Party Settlements | $ 858,168 |
| Advances from Third Party Payors | $ 481,800 |
| Due to St. Luke's-Bethlehem/Q'twn | $ - |
| Accrued Payroll, Vacation, Taxes | $1,214,372 |
| Accrued Other | $ 193,893 |
| Long Term Debt-Leases/Note Payable | $ 942,511 |
| Accrued Malpractice Costs | $ 91,000 |
| | $ 4,848,188* |

\* Excludes $177,984 Current Liabilities amount for "Due to St. Luke's-Bethlehem/Quakertown."
[7] Section 4404 of the Balanced Budget Act of 1997 (Pub. L. 105-33) amended §1861(v)(1)(O)(i) of the Social Security Act to terminate Medicare recognition of gains and losses for depreciable assets resulting from either their sale or scrapping. Conforming modifications to the applicable regulation were made December 1, 1997, the effective date for implementing the new rule.

specific regulation that controlled the recognition of a loss on mergers, the merger in question was not required to meet the *bona fide* sales transaction addressed in 42 C.F.R. § 413.134(f)(2). The Board found persuasive that, in light of the changing healthcare environment and lack of a market for the Provider's facilities, the assumption of liabilities assumed in the merger equated to the fair market value of the Provider's assets.

With respect to the allocation of the consideration, the Board found that the "Booth pro-rata method," as revised by the Provider, needed to be reviewed and audited by the Intermediary. Accordingly, the Board remanded the case to the Intermediary to perform the necessary audit procedures to ensure accuracy and appropriateness of the loss calculation and to review the documentation related to the $177,984 liability due to St Luke's-Bethlehem/Quakerstown that was excluded from the consideration. The Board found the Provider's explanation insufficient to determine if the liabilities addressed should have been considered part of the consideration used in the loss calculation.

Finally, the Board disagreed with the Provider's argument that the Deficit Reduction Act (DEFRA) adjustment did not apply to the year at issue. Relying on *Bethesda Hospital Ass'n, v Bowen*, 485 U.S. 399 (1988), which held that the Board may go beyond issues directly before it if the Board deems it necessary, the Board held that the DEFRA adjustment must be applied to prevent the Medicare program from paying excess depreciation costs. The Board determined that this adjustment was necessary because the merger transaction was treated as a pooling of interests for accounting purposes, and the value of the assets transferred to St. Luke's in the merger were not "written down." As a result, St Luke's continued to claim depreciation for these assets at their carrying value on the Provider's books at the date of the transaction without considering the decline in their value as evidenced by the loss.[8]

_____

[8] The Provider disagreed with the Board's determination that the amount of the allowable loss should be reduced by the depreciation expense that would have been claimed on the merged assets by the surviving corporation. The Administrator notes that Allentown Osteopathic Medical Center is the Provider before the Board on this appeal, and its cost reporting period is FYE 12/31/1996. Accordingly, the Administrator finds that the subsequent years of the surviving entity (St. Luke's) are not before the Board in this case.

4

## SUMMARY OF COMMENTS

CMM submitted comments requesting that the Administrator reverse the Board's decision. CMM disagreed with the Board's determination that the merger was not subject to the *bona fide sale* requirement of 42 C.F.R. § 413.134(f)(2).

CMM argued that the Provider failed to show that there was a *bona fide* sale of its depreciable assets. CMM argued that the transaction was not a *bona fide* sale due to the great discrepancy between the value of the assets and the consideration properly allocated to them. The Provider transferred total assets valued at approximately $25,171,498 in exchange for approximately $4,848,188, in assumed liabilities. The Provider only received 20 percent of the value of its assets. The record showed that the Provider had discussions with five potential affiliation partners. However, the Provider accepted inadequate compensation for its assets and, therefore, the transaction was not a *bona fide* sale.

The Provider submitted comments requesting that the Administrator affirm the Board's decision to allow the loss on sale. However, the Provider disagreed with the Board's decision to remand the case to the Intermediary for further determination as to the appropriateness of including the $177,984 liability due to St Luke's-Bethlehem/Quakertown in the consideration amount. The Provider argued that the Intermediary had already performed an audit of this transaction on three separate occasions and determined that the liability should not be included in the consideration amount.[9] Accordingly, no further audit work was necessary regarding this issue.

The Provider also submitted comments disagreeing with the Board's decision to remand the case to the Intermediary for a determination of the Medicare utilization rate used to determine Medicare's share of the loss. The Provider argued that the Intermediary had already audited this issue and no further work was necessary. The Provider noted that the Medicare utilization rate determined by the Intermediary was larger than the one used by the Provider to determine Medicare's share of the loss. However, if the Administrator and/or Board would prefer to use the Medicare utilization percentage computed by the Intermediary, the Provider had no objection.

## DISCUSSION

The entire record, which was furnished by the Board, has been examined, including all correspondence, position papers, and exhibits. The Administrator has reviewed

---

[9] Provider's Comments, n.2.

the Board's decision. All comments received timely are included in the record and have been considered.

## I.    Medicare Law and Policy -- Reasonable Costs.

Section 1861(v)(1)(A) of the Social Security Act establishes that Medicare pays for the reasonable cost of furnishing covered services to program beneficiaries, subject to certain limitations. This section of the Act also defines reasonable cost as "the cost actually incurred; excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." The Act further authorizes the Secretary to promulgate regulations establishing the methods to be used and the items to be included in determining such costs. Consistent with the statute, the regulation at 42 C.F.R. § 413.9 states that all payments to providers of services must be based on the reasonable cost of services covered under Medicare and related to the care of beneficiaries.

### A. Capital-Related Costs.

Reasonable costs include capital-related costs. Consistent with the Secretary's rulemaking authority, the Secretary promulgated 42 C.F.R. § 413.130, which lists capital-related costs that are reimbursable under Medicare. Capital-related costs under Medicare include depreciation, interest, taxes, insurance, and similar expenses (defined further in 42 C.F.R. § 413.130) for plant and fixed equipment, and for movable equipment.

Title VI of the Social Security Amendments of 1983[10] added §1886(d) to the Act and established the inpatient prospective payment system (IPPS) for reimbursement of inpatient hospital services provided to Medicare beneficiaries. Under this system, hospitals are reimbursed their inpatient operating costs on the basis of prospectively determined national and regional rates for each discharge according to a list of diagnosis-related groups.  Reimbursement under the prospective payment rate is limited to inpatient operating costs. The Social Security Amendments of 1983[11] amended subsection (a)(4) of §1886 of the Act to add a last sentence which specifies that the term "operating costs of inpatient hospital services" does not include "capital-related costs (as defined by the Secretary for periods before October 1, 1986)...." That provision was subsequently amended until finally, §4006(b) of Omnibus Budget Reconciliation Act (OBRA) 1987 revised §1886(g)(1) of the Act to require the Secretary to establish a prospective payment system for the capital-related costs of IPPS hospitals for cost reporting periods beginning in fiscal year (FY) 1992.

---

[10] Pub. L. 98-21.
[11] Section 601(a) (2) of Pub. L. 98-21.

6

### 1. Depreciation.

For cost years prior to the implementation of capital PPS, pursuant to the reasonable cost provision of §1861(v)(1)(A) of the Act, the Secretary promulgated regulations on the payment of capital costs, including depreciation. Generally, the payment of depreciation is based on the valuation of the depreciable assets used for rendering patient care as specified by the regulation. The Secretary explained, regarding the computation of gains and losses on disposal of assets, that:

> Medicare reimburses providers for the direct and indirect costs necessary to the provision of patient care, including the cost of using assets for inpatient care. Thus, depreciation of those assets has always been an allowable cost under Medicare. The allowance is computed on the depreciable basis and estimated useful life of the assets. When an asset is disposed of, no further depreciation may be taken on it. However, if a gain or loss is realized from the disposition, reimbursement for depreciation must be adjusted so that Medicare pays the actual cost the provider incurred in using the asset for patient care.[12]

Basically, when there is a gain or loss, it means either that too much depreciation was recognized by the Medicare program resulting in a gain to be shared by Medicare, or insufficient depreciation was recognized by the Medicare program resulting in a loss to be shared by the Medicare program. An adjustment is made so that Medicare pays the actual cost the provider incurred in using the asset for patient care.

Although a gain or loss is recognized in the year of the disposal of the asset, the determination of Medicare's share of that gain or loss is attributable to the cost reporting periods in which the asset was used to render patient care under the Medicare program. Accordingly, although the event of the disposal of the asset may occur after the implementation of capital–PPS, a portion of the loss or gain may be attributable to cost years paid under reasonable costs and prior to the implementation of capital-PPS.

The regulation at 42 C.F.R. § 413.130 explains, _inter alia_, that:

> (a) *General rule.*   Capital related costs ... are limited to:
> (1) Net depreciation expense as determined under §§ 413.134, 413.144, and 413.149, adjusted by gains and losses realized from

---

[12] 44 Fed. Reg. 3980 (Jan. 19, 1979).

> the disposal of depreciable assets under 413.134(f)..... (Emphasis added.)

The regulation specifies that only certain events will result in the recognition of a gain or loss in the disposal of depreciable assets. The Secretary explained in 1976, proposed amendments to the regulation clarifying and expanding existing policy on the recognition of gains and losses, that:

> The revision would describe the various types of disposal recognized under the Medicare program, and would provide for the proper computation and treatment of gains and losses in determining reasonable costs.[13]

In adopting the final rule, the Secretary again explained that:

> Existing regulations contain a requirement that any gain or loss realized on the disposal of a depreciable asset must be included in Medicare allowable costs computations.... The regulations, however, specify neither the procedures for computation of the gain or loss, nor the methods for making adjustment to depreciation.    These amendments provide the rules for the treatment of gain or loss depending upon the manner of disposition of the assets.[14] (Emphasis added.)

These rules have been set forth at 42 C.F.R. § 413.134(f), which explains the specific conditions under which the disposal of depreciable assets may result in a gain or loss under the Medicare program. This section of the regulation states:

> (1) *General*. Depreciable assets may be disposed of through sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft, or other casualty. If disposal of a depreciable asset results in a gain or loss, an adjustment is necessary in the provider's allowable cost. The amount of a gain included in the determination of allowable cost is limited to the amount of depreciation previously included in Medicare allowable costs. The amount of a loss to be included is limited to

---

[13] 41 Fed. Reg. 35197 (Aug. 1976) "Principles of Reimbursement for Provider Costs: Depreciation: Allowance for the Depreciation Based on Asset Costs." (Proposed rule.)

[14] 44 Fed. Reg. 3980 (1979), "Principles of Reimbursement for Provider Costs."(Final rule.)

the undepreciated basis of the asset permitted under the program. <u>The treatment of the gain or loss depends upon the manner of disposition of the asset, as specified in paragraphs (f)(2) through (6) of this section</u> ....(Emphasis added.)

The method of disposal of assets set forth at paragraph (f)(2) through (6) is set forth as follows. Paragraph (f) (2) addresses gain and losses realized from the *bona fide* sale of depreciable assets and states:

*Bona fide sale or scrapping*. (i) Except as specified in paragraph (f)(3) of this section, gains and losses realized from the <u>bona fide</u> sale or scrapping of depreciable assets are included in the determination of allowable cost only if the sale or scrapping occurs while the provider is participating in Medicare.... (Emphasis added).

With respect to paragraph (f) (2) and the *bona fide* sale of a depreciable asset, § 104.24 of the Provider Reimbursement Manual (PRM) states that:

A *bona fide* sale contemplates an arm's length transaction between a willing and well informed buyer and seller, neither being under coercion, for reasonable consideration. An arm's length transaction is ... negotiated by unrelated parties, each acting in its own self interest.[15]

With respect to assets sold for a lump sum, paragraph (f) (2) (iv) specifies:

If a provider sells more than one asset for a lump sum sales price, the gain or loss on the sale of each depreciable asset must be determined by allocating the lump sum sales price among all the assets sold, in accordance with the fair market value of each asset as it was used by the provider at the time of sale. If the buyer and seller cannot agree on an allocation of the sales price, or if they do agree but there is insufficient documentation of the current fair market value of each asset, the intermediary for the selling provider will require an appraisal by an independent appraisal expert to establish the fair market value of each asset and will make an allocation of the sale price in accordance with the appraisal.

Paragraph (f)(3) addresses gains or losses realized from sales within one year after the provider terminates from the program, while 42 C.F.R. § 413.134(f)(4) addresses

---

[15] Trans. No. 415 (May 2000) (clarification of existing policy).

exchange, trade-in, or donation,[16] of the asset stating that: "[g]ains or losses realized from the exchange, trade-in, or donation of depreciable assets are not included in the determination of allowable cost." Finally, paragraph (f)(5) explains the treatment of gains and losses when there has been an abandonment (permanent retirement) of the asset, and paragraph (f)(6) explains the treatment when there has been an involuntary conversion, such as condemnation, fire, theft, or other casualty.

### 2. Revaluation of Assets.

Historically, as reflected in the regulation, the disposal of a depreciable asset used to render patient care may result in two separate and distinct reimbursement events: 1) the calculation of a gain or loss for the prior owner and 2) a revaluation of the depreciable basis for the new owner. While the determination of gains and losses is generally only of interest to the prior owner,[17] the new owner in the same transaction is interested in the determination of when Medicare will allow the revaluation of depreciation for purposes of calculating the new owner's depreciation expense.

This latter issue, on the revaluation of assets, was the subject of significant litigation for the Medicare program regarding complex transaction and resulted in agency rulemaking on the subject. In response to litigation, the regulations at 42 C.F.R. §413.134(l)(1996)[18] were promulgated to address longstanding Medicare policy regarding depreciable assets exchanged for capital stock, statutory mergers and consolidation. Concerning the valuation of assets, the regulation states that:

> (l) *Transactions involving provider's capital stock*—(1) *Acquisition of capital stock of a provider.* If the capital stock of a provider is acquired, the provider's assets may not be revalued. For example, if Corporation A purchases the capital stock of Corporation B, the provider, Corporation B continues to be the provider after the purchase and Corporation A is merely the stockholder. Corporation B's assets may not be revalued.

---

[16] A donation is defined in 42 C.F.R. § 413.134(b)(8). An asset is considered donated when the provider acquires the assets without making payment in the form of cash, new debt, assumed debt, property or services. Section 4502.12 of the Intermediary Manual states that when a provider is donated as an ongoing facility to an unrelated party, there is no gain/loss allowed to the donor. The valuation of the assets to the donor depends upon use of the assets prior to the donation.

[17] While this is the general rule, the new owner can also have an interest in the gain or loss, when the new owner is to acquire the Medicare receivables for the terminating cost report along with the depreciable assets.

[18] Originally codified at 42 C.F.R. § 405.415(l).

(2) *Statutory merger*. A statutory merger is a combination of two or more corporations under the corporation laws of the State, with one of the corporations surviving. The surviving corporation acquires the assets and liabilities of the merged corporation(s) by operation of State law. The effect of a statutory merger upon Medicare reimbursement is as follows:

(i)     *Statutory merger between unrelated parties.* If the statutory merger is between two or more corporations that are unrelated (as specified in §413.17), the assets of the merged corporation(s) acquired by the surviving corporation may be revalued in accordance with paragraph (g) of this section. <u>If the merged corporation was a provider before the merger, then it is subject to the provisions of paragraphs (d) (3) and (f) of this section concerning recovery of accelerated depreciation and the realization of gains and losses.</u> The basis of the assets owned by the surviving corporation are unaffected by the transaction….

(ii)    *Statutory merger between related parties.* If the statutory merger is between two or more related corporations (as specified in §413.17), no revaluation of assets is permitted for those assets acquired by the surviving corporation…. Under these circumstances, at the time of the merger the transaction is one between related parties and is not a basis for revaluation of the provider's assets.

## B. Related Organizations

The regulation at 42 C.F.R. § 413.134 references the related organization rules at 42 C.F.R. § 413.17. The regulation at 42 C.F.R. § 413.17, states, in pertinent part:

(b) *Definitions. (1) Related to the provider.* Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.

(2) *Common ownership.* Common ownership exists if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.

   (3) *Control*. Control exists if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.

Consistent with the Act and the regulations, the above principles are set forth in the Provider Reimbursement Manual (PRM), which provides guidelines and policies to implement Medicare regulations for determining the reasonable cost of provider services. In determining whether the parties to a transaction are related, the PRM at § 1004, et seq., establishes that the tests of common ownership and control are to be applied separately, based on the facts and circumstances in each case. With respect to common ownership, the PRM at § 1004.1 states:

> This rule applies whether the provider organization or supplying organization is a sole proprietorship, partnership, corporation, trust or estate, or any other form of business organization, proprietary or nonprofit. In the case of nonprofit organization, ownership or equity interest will be determined by reference to the interest in the assets of the organization (e.g., a reversionary interest provided for in the articles of incorporation of a nonprofit corporation).[19]

Concerning the definition of control, the PRM at § 1004.3 states: "[t]he term 'control' includes any kind of control, whether or not it is legally enforceable and however it is exercisable or exercised." The concept of "continuity of control" is illustrated at § 1011.4 of the PRM, in Example 2 which reads as follow:

> The owners of a 200-bed hospital convert their facility to a nonprofit corporation. The owners sell the hospital to a non-profit corporation under the direction of a board of trustees made up of former owners of the proprietary corporation. Both corporations are considered related organizations; therefore, the asset bases to the nonprofit corporations remain the same as contained in the proprietary corporation's records, and there can be no increase in the book value of such assets.

The related party organization was further explained in HCFA Ruling 80-4 which adopted the Eighth Circuit Court of Appeals' decision in Medical Center of Independence v. Harris, 628 F.2d 1113 (8th Cir. 1980).[20]  The Ruling pointed out

---

[19] Trans. No. 272 (Dec. 1982) (clarifying certain ambiguous language relating to the determination of ownership or equity interest in nonprofit organizations).

[20] In Medical Center of Independence v. Harris, supra, the court held that a medical center and a management corporation from which it leased and operated a hospital facility were related organizations within the meaning of 42 C.F.R. §413.17, where the management corporation had purchased the assets of the hospital and had

that the applicability of the related organization rule is not necessarily determined by the absence of a relationship between the parties prior to their initial contracting, although those factors are to be considered. The applicability of the rule is determined by also considering the relationship between the parties according to the rights created by their contract. The terms of the contracts and events which occurred subsequent to the execution of the contract in that case had the effect of placing the provider under the control of the supplier.

### C. Non-Profit Corporations and the Related Parties and Disposal of Depreciable Asset Regulations.

#### 1. Program Memorandum A-00-76.

To clarify the application of 42 C.F.R. §413.134(l) to non-profit providers with respect to the related party rules and the rules on the disposal of depreciable assets, CMS issued Program Memorandum (PM) A-00-76, dated October 19, 2000. This PM applies the foregoing regulations to the situation of non-profit corporations. In particular, this PM noted that non-profits differ in significant ways from for–profit organizations. Non-profit organizations typically do not have equity interests (i.e., shareholders, partners), exist for reasons other than to provide goods and services for a profit, and may obtain significant resources from donors who do not expect to receive monetary repayment of, or return, on the resources they provide. These differences, among others, cause non-profit organizations to associate or affiliate through mergers or consolidations for reasons that may differ from the traditional for-profit merger or consolidations. In contrast, the regulations at 42 C.F.R. § 413.134(l) were written to address only for-profit mergers and consolidations.

The PM A-00-76 also noted that, unlike for-profit mergers or consolidations, which often involve a dispatching of the former governing body and/or management team, many non-profit mergers and consolidations involve the continuation, in whole or part, of the former governing board and/or management team. Thus, in applying the

---

entered into a 15 year lease agreement with the hospital, with a management agreement to run concurrently with the lease, and where six employees of the management corporation were elected as directors of the hospital, and two were elected as hospital officers. The court upheld the district court's finding that the management corporation had the power, directly or indirectly, significantly to influence or direct the actions or policy of the hospital, and rejected a contention that potential influence, in the absence of a past and present exercise of influence, is insufficient to warrant a finding of control. The court stated that, while the absence of any prior relationship between the parties is relevant to the issue of control, it should not automatically lead to the conclusion that the related party principle does not apply.

related organization principles of 42 C.F.R. § 413.17, CMS stated that consideration must be given to whether the composition of the new board of directors, <u>or other governing body and/or management team</u> include significant representation from the previous board or management team. If that is the case, no real change of control of the assets has occurred and no gain and loss may be recognized as a result of the transaction. This PM A-00-76 recognized that, <u>inter alia</u>, certain relationships formed as a result of the consolidation of two entities constituted a related party transaction for which a loss on the disposal of assets could not be recognized. The PM A-00-76 stressed that "between two or more corporations that are unrelated" should include the relationship between the constituent hospitals and the surviving or consolidating entity. Consequently, the PM A-00-76 states that:

> [W]hether the constituent corporations in a merger or consolidation are or are not related is irrelevant; rather the focus of the inquiry is whether significant ownership or control exists between a corporation that transfers assets and the corporation that receives them.

The PM A-00-76 stated that the term "significant," as used in PM A-00-76 has the same meaning as the term "significant" or "significantly," in the regulations at 42 C.F.R. § 413.17 and the PRM at Chapter 10. Important considerations in this regard include that the determination of common control is subjective; each situation stands on its own merits and unique facts; a finding of common control does not require 50 percent or more representation; there is no need to look behind the numbers to see if control is actually being exercised, rather the mere potential to control is sufficient.

In addition, PM A-00-76 stated that many non-profit mergers and consolidations have only the interests of the community at large to drive the transaction. This community interest does not always involve engaging in a *bona fide* sale or seeking fair market value of assets given. Rather, the assets and liabilities are simply combined on the merger/consolidated entities books. The merged/consolidated entity may, or may not, record a gain or loss resulting from such a transaction for financial reporting purposes. However, notwithstanding the treatment of the transaction for financial accounting purposes, no gain or loss may be recognized for Medicare payment purposes unless the transfer of the assets resulted from a *bona fide* sale as required by the regulation at 42 C.F.R. § 413.134(l) and as defined in the PRM at §104.24.

The PM A-00-76 further explained that, in evaluating whether a *bona fide* sale has occurred with respect to mergers or consolidation between or among non-profits entities, a comparison of the sale price with the fair market value of the assets is a required element of the analysis. A large disparity between the sales price and the fair market value of the assets sold indicates the lack of a *bona fide* sale.

Notably, the Administrator finds that the requirement that the term "between related organizations" includes an examination of the relationship before and after a transaction of assets under 42 C.F.R. §413.417[21] was applied as early as 1977 by the agency in evaluating whether accelerated depreciation would be recaptured. The agency decided that "when the termination of the provider agreement results from a transaction between related organizations and the successor provider remains in the health insurance program and its asset bases are the same as those of the terminated providers, health insurances reimbursement is equitable to all parties." Thus, the depreciation recovery provisions would not be applied.[22] The agency looked specifically at whether, in a related party transaction, the control and extent of the financial interest remained the same for the owners of the provider before and after the termination.[23] Thus, this interpretation of the related party rules as requiring an examination of the relationship before and after the transfer of assets is consistent with early Medicare policy and HCFA Ruling 80-4.

This interpretation, that "between related organizations" must include an examination of all parties to the transaction, both before and after, is also consistent with the reality of a transaction involving the merging of two or more entities. For example:

> Corporation A and Corporation B, both non-profit providers, are combined by statutory merger with Corporation A surviving. Corporations A and B were unrelated prior to the transaction, each being controlled by its respective Board of ten Directors. After the merger, Corporation A's new ten member Board of Directors includes five individuals that served on Corporation B's pre-merger board. Thus, Corporation A's new Board of Directors includes a significant number of individuals from both of the former entities' boards. Because no significant change of control of the assets of former Corporation B has occurred, the transaction as between Corporation A and Corporation B is deemed to be between related parties and no gain or loss will be recognized as a result of the transaction. Hence, Medicare reasonably examines the relationship between the merging corporations and the surviving corporation and recipient of the

---

[21] Originally codified at 42 C.F.R. § 405.427.

[22] 42 Fed. Reg. 45897 (Sept. 15, 1977).

[23] 42 Fed. Reg. 45897, 45898 (Sept. 15, 1977) (Recovery of excess cost resulting from the use of accelerated depreciation when termination of provider agreement results from transaction between related organizations).

Medicare depreciable assets to determine whether the transfer involved a related party transaction.[24]

Therefore, in determining whether a provider will be reimbursed for depreciation expenses under Medicare, the Administrator finds that CMS applies a two-prong test. The first question is whether the parities are "related parties" or "unrelated parties" under the Medicare regulations. If the parties are related, they cannot engage in a *bona fide* sale and the analysis ends. If the parties are unrelated, however, the second question is whether the parties engaged in a *bona fide* sale. If the parties engaged in a *bona fide* sale, then a reimbursement for adjusted depreciation cost is proper.

## 2. The Intermediary CHOW Manual and APB No. 16.

The Intermediary Manual, Chapter 4000, et seq., also addresses changes of ownership (CHOW) for purposes of Medicare certification and reimbursement. These sections provide guidelines based on Medicare law, regulations and implementing instructions for use by the Medicare intermediaries and providers on the reimbursement implications of various types of changes of provider organizations transactions or CHOWs. Section 4502 explains that the first review of a CHOW transaction is to determine the type of transaction which occurred as the Medicare program has developed specific policies on the reimbursement effect of various types of CHOW transactions which may be different from treatment under generally accepted accounting principles or GAAP. Section 4502.1, list the various types of provider organizational structures and included as one possible type of provider organization are corporations.

In defining a Corporation, § 4502.1 explains that a corporation is a legal entity which enjoys the rights, privileges and responsibilities of an individual under the law. An interest in a corporation is represented by shares of stock in proprietary situations (stockholders) or membership certificates in non-stock entities (members).

Among the various types of provider structures and transactions recognized by Medicare are mergers, consolidations, and corporate reorganizations at § 4502. Section 4502.6 describes a statutory merger as the combination of two or more corporations pursuant to the law of the State involved, with one of the corporations surviving the transaction. Medicare permits a revaluation of the assets acquired in a statutory merger between unrelated parties, when the surviving corporation is a provider. If the surviving corporation is a provider or a related organization to the provider – such as a chain home office, the assets acquired can be revaluated. However, the merger of a non-provider corporation into a provider corporation is not

---

[24] Program Memorandum A-00-76 at p.3.

16

a change in ownership for the provider corporation and as such does not result in the revaluation of the assets of the provider corporation.

In the instance of reorganization, CMS examines, inter alia, the parties before and after the transaction in determining that the transfer of assets involved a related party transaction.

Section 4508.11 of the Intermediary Manual,[25] in addressing stock corporations states that, Medicare program policy places reliance on the generally accepted accounting principles or GAAP, as expressed in Accounting Principles Bulletin (APB) No. 16 in the reevaluation of assets and gain/loss computation processes for Medicare reimbursement purposes. While in certain areas, Medicare program policy deviates from that set forth in GAAP,[26] Intermediaries are instructed to refer to the principles outlined in the CHOW manual which specify when reference to APB No. 16 is in accordance with the current Medicare policy.[27]

Generally, APB No. 16 suggests two approaches to the treatment of assets when there is a business combination involving stock corporations: the pooling method and the purchase method. Historically, a combination of business interest was characterized as either a "continuation of the former ownership" or "new ownership." A continuation of ownership was accounted for as a pooling of interest. The pooling of interest method accounts for business combinations as the uniting of the ownership interests of two or more companies. No acquisition is recognized because the combination is accomplished without disbursing resources of the constituents and ownership interests continue. The pooling of interests method results in no revaluation of assets or recording of gains or losses. In contrast, "new ownership" is accounted for as a purchase. The purchase method accounts for a business combination as the acquisition of one company by another and is treated as purchase or sale. Thus, APB No. 16 is similar to the PM, in that both recognize and treat the pooling of interests in a business combination as an event resulting in no gain or loss, while recognizing and treating a bona fide purchase or sale in a business combination as an event resulting in a gain or loss.

---

[25] Section 4504.1 states that: "[W]here Medicare instructions are silent as to the valuation of consideration given in an acquisition, rely upon generally accepted accounting principles. APB No. 16 discusses valuation methods of consideration given for assets acquired in business combinations."

[26] For example, Medicare will not recognize a revaluation/gain or loss due to a transfer of stock or in the case of a "two-step" transaction (i.e., the transfer of stock, than the transfer of the depreciable assets).

[27] Financial Accounting Standards Board (FASB) No. 141 superseded APB No. 16 effective June 2001. However, at the present, not-for-profit (NFP) organizations are excluded from the scope of FASB No. 141.

### D. Similarities of Internal Revenue Service Principles and Medicare Reimbursement Principles When Entities Consolidate.

This policy of not recognizing a gain or loss when the transaction is between related parties, whether it constitutes a reorganization or consolidation, is also consistent with Internal Revenue Service (IRS) rules on the non-recognition of a gain or loss when a statutory reorganization has been determined to have occurred. Relevant to this case, while the Medicare rules may diverge from IRS rules and Medicare policy is not bound by IRS policy, IRS policy often reflects rationale underlying the establishment of similar policies under Medicare.[28] In fact, in setting forth principles applicable to the recognition of the gain or a loss, CMS has in the past recognized the similarity of the Medicare principles and the IRS principles and has often explicitly stated when such Medicare policy agrees or diverges from IRS treatment.[29]

Under IRS rules, some consolidations are considered statutory reorganizations and subject to the non-recognition of a gain or loss. The terms reorganization and consolidation are not mutually exclusive terms under IRS rules. Medicare policy similarly indicates that they are not mutually exclusive terms under Medicare rules. That is, consolidations and mergers may in fact constitute in essence, reorganizations and reorganizations may involve more than one corporation.[30] For example, a consolidation where the predecessor corporation board continues significant control in the new corporation board is treated the same as a reorganization for Medicare reimbursement purposes and no gain or loss is recognized. However, for example, where the predecessor corporation board does not continue significant control in the new corporation board, a gain or loss will be recognized for Medicare reimbursement purposes.

---

[28] See, e. g., Guernsey v. Shalala, 514 U.S. 1232 (1995), analogizing Medicare rules to IRS rules in citing to Thor Power Tools v. Commissioner, 439 U.S. 522 (1979).

[29] See, e.g., 44 Fed. Reg. 3980 (Jan. 19, 1979) ("If a provider trades in or exchanges an asset, no gain or loss is included in the computation of allowable cost. Instead, consistent with the Internal Revenue Service (IRS), the undepreciated value of the traded asset, plus any additional assets transferred to acquire the new assets, are used as the basis for depreciation of the new asset under Medicare"; 48 Fed. Reg. 37408 (Aug. 18, 1983) (finding that it was not appropriate for the Medicare program to use IRS accelerated costs recovery system for Medicare purposes and deleting IRS useful life guidelines).

[30] See also Black's Law Dictionary definition of a reorganization used interchangeably with merger and consolidation("A reorganization that involves a merger or consolidation under a specific State statute.")

18

Similar to Medicare rules, the IRS does not allow the recognition of the gain or loss when there is a reorganization, inter alia, because no gain or loss has in fact been realized. As the courts have noted:

> The principle under which statutory reorganizations are not considered taxable events is that no substantial change has been affected either in the nature or the substance of the taxpayer's capital position, and no capital gain or loss has actually been realized. Such a reorganization contemplates a continuity of business enterprise and a continuity of interest and control accomplished [in this instance] by an exchange of stock for stock.[31] (Emphasis added.)

Similarly, the courts have stated that the underlying purpose of the IRS provisions that find no gain or loss when there is a reorganization was twofold: "1) to relieve certain types of corporate reorganizations from taxation which seemed oppressively premature and 2) to prevent taxpayer's from taking losses on account of wash sales and other fictitious exchanges."[32] Finally, as the Supreme Court found in *Groman v. Commissioners*, 302 U.S 82, 87 (1937), certain transactions speak for themselves, regardless of how they might be cast. As the Supreme Court observed: "If corporate A and B transfer assets to C, a new corporation, in exchange for all of C's stock, the stock received is not a basis for calculation of a gain on the exchange... A and B are so evidently parties to the reorganization that we do not need [the IRS code] to inform us of the fact." In sum, the purpose of these provisions is "to free from the imposition of an income tax purely 'paper profits or losses' wherein there is no realization of gain or loss in the business sense but merely the recasting of the same interests in a different form."[33]

---

[31] *Commissioners of IRS v. Webster Estates*, 131 F. 2d 426, 429 (2nd Cir.1942), citing *Helvering v. Schoellkopf*, 100 F. 2d 415 (2nd Cir. 1938). While the foregoing IRS cases illustrate the continuity of interest, the Administrator notes that the Medicare program does not recognize a loss on sale as a result of a stock transfer regardless of the relationship between the parties. Case law also shows that term "continuity of interest" as provided in the IRS regulation is at times used interchangeably with the term "continuity of control." See e.g. *New Jersey Mortgage and Title Co. v. Commissioner of the IRS*, 3 T. C. 1277 (1944); *Detroit–Michigan Stove Company v. U.S.*, 128 Ct. Cl. 585 (1954).

[32] *C.H. Mead Coal Co. v. Commissioners of IRS*, 72 F. 2d 22, 27-28 (4th Cir. 1934) (analyzing early sections of the code).

[33] *Paulsen ET UX v. Commissioner*, 469 U.S. 131 (9th Cir. 1985) citing *Southwest Natural Gas Co. v. Commissioner*, 189 F. 2d 332, 334 (5th Cir. 1951), cert. denied, 342 U.S. 860 (1951) (quoting *Commissioner v. Gilmore's Estate*, 130 F. 2d 791, 794 (3rd Cir. 1942)).

The IRS rules also deny gains or losses from the sale or exchange of property between related parties. In explaining the rationale for this tax law provision, the court in *Unionbancal Corporation v. Commissioner*, 305 F. 3d 976 (9th Cir. 2001), explained that:

> This limitation on deductions for transfers between related parties, protects the fisc against sham transactions and manipulations without economic substance. Not infrequently though, there are honest and important non-tax reasons for sales between related parties, so it's important to fairness to preserve the pre-sale basis where loss on the sale itself isn't recognized for tax purposes. Otherwise the statute would be a heads-I-win, tails-you-lose provision for the IRS: the seller can't take the loss, but the IRS calculates the buyer's gain on resale using the lower basis.

Consequently, one purpose of the IRS policy is to prevent the claiming of a gain or loss when no such event has in fact occurred. Similarly, the related party rules under Medicare, in holding that there is no recognition of a gain or loss when there is a reorganization, or consolidation between related parties, is to avoid the payment of costs not actually incurred by the parties. An overarching principle applicable under the Medicare statute and regulation, with which all reasonable cost regulations must be in accord, is the principle that Medicare will only share in costs actually incurred by the provider. Consistent with IRS rules which recognize that no cost has been incurred under the foregoing facts, Medicare similarly does not find that the provider has incurred an actual cost for purposes of Medicare reimbursement under such facts.

## II. Finding of Facts and Conclusion of Law.

Applying the statute, regulations, PRM and CMS policy to the fact of this case, the Administrator finds that, as the transaction did not involve an arm's length transaction, the transaction was not a *bona fide* sale as required under the regulations and PRM for the recognition of a loss on the disposal of assets.

First, the Administrator notes that the Intermediary compared the Board of Directors of the Provider prior to the transaction to the Board of Directors of the surviving entity and concluded that there was no significant influence of the Provider on the surviving entity. The Administrator observes that the Agreement provided that the Provider's Board of Trustees would serve as an "other body" as that term is defined in the Pennsylvania Nonprofit Corporation Law.[34] The Agreement provided that the

---

[34] Provider's Exhibits P-1 p.2 §2.1. Three representatives of the Provider's "other body" were elected to the Board of St. Luke's.

Provider's existing trustees would be elected to the newly constituted "other body" upon completion of the Agreement, each for a term of one year and that the operating polices and procedures, along with recommendations for medical staff appointment quality improvement oversight and accreditation compliance was delegated to the Provider's "other body" subject to St. Luke's review and comment.[35]  Consequently, the record indicates that, to a large part, the merger involved the continuation of the former governing Board of Trustees within the larger framework of the surviving entities health care delivery system.  However, because of the Intermediary's position, the Board and the parties did not address the related party issue.   While a *bona fide* sale contemplates an arm's length transaction, between unrelated parties, the Administrator finds that the related party issue need not be decided at this time in order to determine whether any gain or loss can to be recognized in this case.

Instead, consistent with 42 C.F.R. 413.134(f)(2) and as outlined in PM A-00-76 and PRM § 104.24, in evaluating whether a *bona fide* sale has occurred with respect to a merger or consolidation between or among nonprofit entities, a comparison of the sale price with the fair market value of the assets acquired is also required.  A large disparity between the sale price (consideration) and the fair market value (FMV) of the assets sold indicates the lack of reasonable consideration and, hence, the lack of a *bona fide* sale. Examples of transactions that raise the issue of a *bona fide* sale are set forth in PM A-00-76:

> In some situations, the sale price of the assets may be barely in excess of, or less than, the market value of the current assets sold, leaving a minimal, or no, part of the sales price to be allocated to the fixed (including depreciable) assets.  In such circumstance, effectively the current assets have been sold, and the fixed assets have been given over a minimal or no cost. If a minimal or no portion of the sales price is allocated to the fixed (including depreciable) assets a bona fide sale of those assets has not occurred.

The PM A-00-76 further states that:

> Non-monetary consideration, such as a seller's concession from a buyer that the buyer must continue to provide care for a period of time or to provide care to the indigent, may not be taken into account in evaluating the reasonableness of he overall consideration (even where such elements may be quantified in dollar terms). These factors are more akin to goodwill than to considerations.

---

[35] Id.

In this case, the record shows that assets were transferred from the Provider to St. Luke's for the assumption of liabilities totaling $4,848,188.[36] The record further shows that no appraisal of the Provider's assets had been conducted (before or after the merger) to determine their FMV.[37] The record shows that the Provider's net book value of its depreciable assets was approximately $25 million with non-depreciable assets totaling approximately $13 million.[38] Further, the surviving entity treated the transaction as a "pooling of interest."[39] The Administrator's finds that these facts indicate the lack of reasonable consideration and, hence, the lack of a *bona fide* sale.

The Administrator notes that, in evaluating whether a *bona fide* sale has occurred, PM-A-00-76 explained that a comparison of the sales price with the FMV of the assets was a required aspect of the analysis. The record shows that no appraisal was

---

[36] Supra n. 6.
[37] Tr. at 27 and 261.
[38] Provider's Exhibit P-93.

| **Non- Depreciable Assets** | | **Depreciable Assets** | |
|---|---|---|---|
| Current Assets | $5,805,118 | Parking Lot | $554,463 |
| Non-Current Assets | | | |
| (Long Term Investments) | $2,686,549 | Building and Improvements | $6,764,448 |
| Land | $2,423,081 | Fixed Equipment | $1,295,188 |
| Other Assets | $164,063 | Moveable Equipment | |
| $3,437,305 | | | |
| Construction in Progress | $2,041,283 | Total Depreciable Assets | $12,051,404 |
| Total Non-Dep. Assets | $13,120,094 | Other Adjustments: | |
| | | Non-Allowable Offset | $(232,917) |
| | | Other Adjustment: | |
| | | Pre-Medicare Assets | $(83,346) |
| | | Adj. Dep. Assets | $11,735,141 |

[39] Intermediary's Exhibit I-22, p. 6. Report of Independent Accountants on Financial Statements. "Effective January 1, 1997, the net assets of Allentown Osteopathic Medical Center (Allentown Medical Center), a nonprofit tax-exempt acute care hospital located in Allentown, Pennsylvania, were merged into St. Luke's Hospital. The merger was accounted for as a pooling of interest and, accordingly, the accompanying 1997 financial statements include the operations of Allentown Medical Center for the entire fiscal year and the 1996 financial statements have been restated to include the accounts and operations of the former Allentown Medical Center."

conducted to determine the FMV of the depreciable assets by the Provider.[40]  The Administrator finds that the failure to conduct an appraisal is an indication that factors other than receiving the best price for its assets were motivations in the transaction.  In particular, documents in the record that were created in the time period leading up to the merger shows that the Provider's main concerns were:

- To implement an affiliation that would enable the Provider and its physicians to effectively participate in one of the leading health care delivery systems in the area;
- To obtain sufficient capital to address resource needs, including facilities, medical staff, information systems, and program development;
- To support medical staff development and to promote greater physician-hospital integration;
- To become well-positioned for managed care.[41]

Further, the Provider's main negotiating priorities of the merger were:

- To remain a full-service acute care hospital;
- To have a formal presence in Osteopathic teaching and to continue to have Osteopathic education programs and affiliations;
- To have a pluralistic approach to medical staff, i.e., independent;
- To participate in managed care contracts.[42]

These factors reflect that, for the Provider, the value of the assets and the consideration involved in the transaction was not a factor in the merger negotiations. Therefore, the importance of these other factors in the merger transaction further supports a finding that no *bona fide* sales transaction occurred.

In addition, the record shows that the Provider's non-depreciable current assets alone were valued at $ 5.8 million and the non-current long-term investments were valued at $2.6 million, while the debt assumed was valued at $4.8 million.[43]  The absence of an appraisal in the record does not prevent a finding that no reasonable consideration was paid for the depreciable assets, as the value of the current assets and non-current long term investments well exceeded the value of the debt

---

[40] Provider's Exhibit P-18.  Intermediary workpapers indicating that the Intermediary requested a copy of an appraisal and that the Provider explained that none was done for the transaction.

[41] Provider's Exhibit P-3.

[42] Provider's Exhibit P-4.

[43] Provider's Exhibit P-93.

assumed.[44]   As a practical matter, the depreciable assets were transferred for essentially no consideration.   Accordingly, the Administrator finds that, as the transaction did not involve an arm's length transaction, the transaction was not a *bona fide* sale as required under the regulations and PRM for the recognition of a loss on the disposal of assets.

As a loss cannot be allowed in this case, the Administrator does not reach the issue of how to calculate the loss. However, the issue of calculating a loss does point out certain anomalous results of finding that a loss is to be calculated in a case when there has been no *bona fide* sale, especially where the value of the current assets/non-current cash and cash equivalents transferred is greater than the debt assumed. The Administrator concludes that this further supports a finding that no loss is to be calculated under the facts of this case.

---

[44] If the consideration received is allocated to the cash and cash equivalent assets transferred, on a dollar to dollar bases, the depreciable assets are transferred for no consideration, i.e., a donation. Where there is a donation of depreciable assets, no gain or loss is allowed.

24

## **DECISION**

The decision of the Board is reversed in accordance with the foregoing opinion.

THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE
SECRETARY OF HEALTH AND HUMAN SERVICES

Date: _3|24|08_ _____

Herb B. Kuhn
Deputy Administrator
Centers for Medicare & Medicaid Services

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

St. Luke's Hospital

## DEFENDANTS

Michael O. Leavitt, in his official capacity as Secretary of the U.S. Dept. of Health and Human Services

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF        Lehigh
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Leslie D. Goldsmith, Esq./James P. Holloway, Esq.
Ober, Kaler, Grimes & Shriver, P.C.
120 East Baltimore Street
Baltimore, MD 21202-1643 - (410) 685-1120

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
◉ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

◉ **C. Administrative Agency Review**

☒ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**     OR     ○ **F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Violations of Medicare Act and Administrative Procedure Act regarding loss resulting from statutory merger    42 USC Sec. 1395oo(f)(1)

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ [_____] JURY DEMAND: | Check YES only if demanded in complaint<br>YES ☐  NO ☒ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE **5·23·08**    SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.