**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ST. LUKE'S HOSPITAL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 08-0883 (JR) |
| | : | |
| KATHLEEN SEBELIUS, Secretary, | : | |
| Health and Human Services, | : | |
| | : | |
| Defendant. | : | |

### MEMORANDUM

Allentown Osteopathic Medical Center, a Medicare provider, merged with St. Luke's Hospital on January 1, 1997. St. Luke's, the surviving entity, sought to recover from Medicare a "loss" on Allentown's depreciable assets that it asserts was recognized in the merger.  That claim was denied by the assigned Medicare intermediary on the ground that the merger was not a "bona fide sale."  The Provider Reimbursement Review Board reversed that decision on appeal, but was itself overruled by the Administrator for the Centers for Medicare and Medicaid Services. Before the court are cross motions for summary judgment on St. Luke's challenge to that final determination.

### Background

Before merging with St. Luke's, Allentown was a non-profit hospital in Allentown, Pennsylvania certified as a Medicare "provider of services."  A.R. 2, 434.  Allentown began to encounter economic difficulties, and lost about $1.3 million in the year before the merger.  A.R. 248, 1339.  Not only was

Allentown losing money, but its facilities were also in need of

an upgrade it could not afford.  Pl. MSJ at 9-10.

Allentown thus began searching for potential

"affiliation partners" and hired KPMG Peat Marwick LLP to help

find them.  Pl. MSJ at 10.  St. Luke's promised to upgrade

Allentown's facilities and made qualified promises to keep

Allentown an in-patient, acute-care hospital, and so a deal was

struck.  A.R. 245-46; 253; 676-78.  The merger occurred on

January 1, 1997 with St. Luke's as the surviving entity.  A.R.

260-63; 564-65.  Title to all of Allentown's assets passed to St.

Luke's, and St. Luke's became responsible for Allentown's $4.8

million in known liabilities.  A.R. 447.  At the time of the

merger, Allentown's financial statements valued its assets at

$25.1 million, including $8.5 million in current and monetary

assets.[1]  A.R. 448; 573.

Medicare functions (believe it or not) by paying

providers based on the cost of procedures -- incentivizing the

use of as many procedures as possible.  Providers are

compensated, not for results, but for "the reasonable cost of

---

[1]   St. Luke's takes issue with the use of these assets by the
Administrator, but because neither St. Luke's nor Allentown made
any effort to appraise Allentown's assets before the transaction,
the Administrator had no other numbers to use -- and neither does
this Court.  St. Luke's argues that Allentown's contingent
liabilities should have been added into the mix of consideration,
but it has failed to provide any evidence of what those
contingent liabilities are or what they are worth, and in any
event Allentown warranted as part of the merger that it had no
contingent liabilities.  A.R. 1120-21.

[Medicare] services," 42 U.S.C. § 1395(b)(1), i.e., "the cost actually incurred . . . [as] determined in accordance with regulations" promulgated by the Secretary, 42 U.S.C. § 1395x(v)(1)(A).  One such cost is the "depreciation on buildings and equipment used in the provision of patient care." 42 C.F.R. § 413.134(a).  Depreciation allowances are paid annually by taking "the cost incurred by the present owner in acquiring the asset," id. § 413.134(b)(1), dividing that purchase price by the asset's estimated useful life, id. § 413.134(a)(3), and dividing again by the percentage of the asset's use devoted to Medicare services.  Thus, a million dollar machine estimated to last ten years that is used on Medicare patients 50 percent of the time would depreciate at $100,000 per year, and would receive an allowance from Medicare of $50,000 per year.  At the end of any given year, the asset has a "net book value," which is the purchase price minus depreciation from previous years.  Thus, after three years of use, our hypothetical million dollar machine would have a net book value of $700,000.  In theory, that net book value represents the fair-market price that asset could yet fetch if sold or treated as an asset in a merger.

The Medicare regulations in effect at the time of the Allentown merger recognized that this was only theory, however, and thus provided that when a capital asset was actually disposed of, either Medicare or the provider could recoup the Medicare-

related difference between the value realized in the disposition and the net book value.[2]  According to those regulations, when two unrelated entities combine pursuant to a statutory merger -- which was the manner in which Allentown and St. Luke's combined -- any "realization of gains and losses" is "subject to the provisions of [42 C.F.R. § 413.134(f)]."  42. C.F.R. § 413.134(k) (formerly 42 C.F.R. § 413.134(l)).  Under section 413.134(f), gains and losses from the disposition of depreciable assets are treated differently depending on the manner of the disposition.  At issue here is whether the Allentown merger accomplished a "bona fide sale," which may result in a gain or loss for Medicare purposes depending on whether the purchase price actually paid was greater or less than the net book value.

On October 19, 2000, the Secretary of CMMS issued Program Memorandum A-00-76, which addressed the application of 42 C.F.R. § 413.134(k).  A.R. 944.   The Program Memorandum clarified the Secretary's interpretation of section 413.124(k), explaining that mergers would be subject to the "bona fide sale" requirement, and defining a "bona fide sale" as an arm's length transaction for reasonable consideration.  A.R. 944; 947.  The memorandum specifically noted that the interpretation was

_____

[2]   Recognizing the endless potential for gamesmanship of the kind at issue here, Congress eliminated reimbursement of losses as of December 1, 1997.  See Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4404 (A.R. 1713-14). CMMS then amended Medicare regulations to eliminate reimbursement of losses. 63 Fed. Reg. 1379, 1380-82 (Jan. 9, 1998).

justified partly because non-profits may combine with other entities for reasons "that may differ from the traditional for-profit merger or consolidation" and that are not "driven by the ownership equity interests to seek fair market value for the assets involved in the transaction."  A.R. 945-46.  The Program Memorandum therefore emphasized that -- just like combinations of for-profit entities -- mergers that involve non-profits must be arm's length transactions for reasonable consideration if gains or losses on depreciable assets are to be realized for Medicare purposes.  A.R. 947.

After the merger, St. Luke's submitted a cost claim to Medicare.  The claim was for $2.9 million, representing depreciation on Allentown's assets that had never been booked or claimed in annual depreciation allowances.  Because the only consideration St. Luke's gave for the assets it acquired in the merger was its assumption of some $4.8 million of Allentown's liabilities, and because this amount fell short of the net book value remaining on Allentown's assets, St. Luke's claimed that the transfer of these depreciated assets represented a "loss" to Allentown compensable by Medicare at $2.9 million.  A.R. 63. And, because Allentown was now a part of St. Luke's, it was St. Luke's that could request reimbursement.

St. Luke's claim was first submitted to a paid contractor known as a Medicare fiscal intermediary, see 42 U.S.C.

§ 1395h, which denied the claim on the ground that the merger was not a bona fide sale.  A.R. 1997.  St. Luke's administratively appealed to the PRRM, which reversed the bona fide sale determination and remanded.  A.R. 69.  The Administrator of CMMS, relying in part on the Program Memorandum, reversed again.  A.R. 2-22.  The Administrator held that Allentown did not receive reasonable consideration for its assets, that the merger was not an arm's length transaction, and that the merger therefore failed to qualify as a bona fide sale from which Allentown had suffered any compensable costs.  A.R. 20-22.  St. Luke's challenges that final determination in this action.

## Analysis

Review of CMMS's determination is governed by 42 U.S.C. § 1396oo(f)(1), which incorporates the Administrative Procedure Act, 5 U.S.C. § 706: final agency action may be set aside only when "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or when "unsupported by substantial evidence."  And under familiar principles of agency review, an agency's interpretation of its own rule is entitled to the utmost deference.  See Ballard v. C.I.R., 544 U.S. 40, 70 (2005) ("An agency's interpretation of its own rule or regulation is entitled to "controlling weight unless it is plainly erroneous or inconsistent with the regulation." (internal quotations omitted)).  "This 'broad deference' is especially warranted

[here] because Medicare regulations are 'complex and highly technical' and determinations in this area 'necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'"  Robert F. Kennedy Med. Ctr. v. Leavitt, 526 F.3d 557, 562 (9th Cir. 2008) (quoting Thomas Jefferson University v. Shalala, 512 U.S. 504, 512 (1994)).

St. Luke's primary argument for overturning the Administrator's decision is that the Secretary's interpretation making statutory mergers subject to the bona fide sale requirement is plainly contrary to the regulations.  Three courts of appeal have already disagreed with this argument.  See Albert Einstein Med. Ctr. v. Sebelius, 566 F.3d 368, 376-77 (3rd Cir. 2009); Robert F. Kennedy, 526 F.3d 557, 560-61; Via Christi Reg'l Med. Ctr. v. Leavitt, 509 F.3d 1259 (10th Cir. 2007).  That consensus is not surprising: the Secretary's interpretation is supported by the text of the regulations and by common sense.

At the time of the merger, 42 C.F.R. § 413.134(k)(2)(I) provided that "the realization of gains and loses" from a statutory merger between unrelated entities is "subject to the provisions of [42 C.F.R. § 413.134(f)]."  Section 413.134(k)(2)(ii) provided that no revaluation of assets was allowed for mergers between related parties.  St. Luke's position is that, because it was unrelated to Allentown, no other impediment stood between it and the realization of a gain or loss

- 7 -

from the merger -- including section 413.134(f).  But it is plainly consistent with the text of the regulation to apply the requirements of section 413.134(f) to a statutory merger between unrelated parties, because the regulations themselves say that realization of gains and losses from such a merger are subject to that section.

At the time of the merger, 42 C.F.R. § 413.134(f) provided that "[d]epreciable assets may be disposed of through sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft, or other casualty," and "[t]he treatment of the gain or loss depends upon the manner of disposition of the asset."  Of the types of disposal specified, the only one that could arguably apply to a merger is a sale. But section 413.134(f)(2) allows for the realization of gains or losses only upon a "bona fide sale."  The reason for this requirement is obvious -- only an arm's length transaction for reasonable consideration ensures that the purchase price is a better reflection of actual value than the net book value.  If the sale is not a bona fide, free-market exchange, the purchase price may be only an illusion, designed to make the asset appear to have lost more value than it really has.  As the Ninth Circuit recently explained:

> Providers are entitled to reimbursement only for
> the "cost actually incurred" in servicing Medicare
> patients.  42 U.S.C. § 1395x(v)(1)(A).  As the
> Secretary noted when promulgating 42 C.F.R.

> § 413.134(f), "if a gain or loss is realized from
> [a] disposition, reimbursement for depreciation
> must be adjusted so that Medicare pays the actual
> cost the provider incurred." See Principles of
> Reimbursement for Provider Costs and for Services
> by Hospital-based Physicians, 44 Fed. Reg. 3980
> (Jan. 19, 1979) (emphasis added).  The Secretary's
> requirements of "reasonable consideration" and
> "fair market value" ensure that Medicare reimburses
> actual costs, instead of providing a windfall to
> providers.

Robert F. Kennedy, 526 F.3d at 562; see also Albert Einstein, 566

F.3d at 376-77; Via Christi Reg'l, 509 F.3d at 1274-77 ("Even if

a consolidation or statutory merger is not a 'sale' per se,

treating it as a sale pursuant to § 413.134(f)(2) ensures that

any depreciation adjustment will represent economic reality,

rather than mere 'paper losses.'").  Thus, the Secretary's policy

is far more reasonable than St. Luke's proposal -- i.e., that

depreciation be recalculated every time there is a merger even

when the amount of assumed liabilities and other consideration

bears no recognizable relationship to the actual depreciation

incurred.  A.R. 944-47.

St. Luke's argues that the Secretary's bona fide sale

requirement makes it impossible for St. Luke's to have realized a

loss or a gain as a result of the merger -- that there would have

no point in paying a market price for Allentown's depreciable

assets because, as the surviving entity, St. Luke's would merely

have reabsorbed that payment after the merger.  That may be true.

But it is true only because the actual sale "price" in this

merger -- the assumption of a non-profit's current liabilities in order to keep it operating -- had nothing to do with the reasonable value of the non-profit's long-term assets.  The Secretary's interpretation does not mean that no statutory merger can ever result in revaluation of depreciable assets.  If a merger involved the assumption of liabilities that closely mirrored the true value of depreciable assets, or involved competitive bidding for those assets, it might satisfy the bona fide sale requirements, even if it involved a non-profit entity like Allentown.  But where, as here, even the plaintiff agrees that the "price" provides no reasonable estimate of market value, see Pl. MSJ 17-18 ("[I]t would be mere happenstance if the fair market value of the merged entity's assets was equal to its known liabilities for which the surviving entity would become responsible."), it would be odd indeed for Medicare to treat the liabilities assumed as a better estimation of market price than the assets' net book value.

A large part of St. Luke's argument is that the Secretary's interpretation is a post hoc rationalization -- that the Secretary changed signals in this case, departing from a previous policy that all statutory mergers automatically trigger the reassessment of depreciable assets.  St. Luke's purports to find that old policy in "informal agency interpretations," Pl. MSJ at 21 n.5, reflected in two letters and a portion the

Medicare Intermediary Manual in effect at the time of the merger.
A.R. 531, 1500-01.  Even if those informal sources do stand for
the proposition that CMMS did not previously subject statutory
mergers to any bona fide sale requirement -- and the issue is at
least unclear, see, e.g., Albert Einstein, 566 F.3d at 376 -- St.
Luke's claim of error founders on the principle that agencies may
change their informal interpretations at any time, so long as
their new position is adequately explained.  See, e.g., FCC v.
Fox Television Stations, Inc., 129 S. Ct. 1800, 1811 (2009)
("[T]he agency must show that there are good reasons for the new
policy. But it need not demonstrate to a court's satisfaction
that the reasons for the new policy are better than the reasons
for the old one; it suffices that the new policy is permissible
under the statute, that there are good reasons for it, and that
the agency believes it to be better, which the conscious change
of course adequately indicates.").  The Program Memorandum
explains that applying the bona fide sales requirement to
statutory mergers is necessary because many mergers are not
"driven by the ownership equity interests to seek fair market
value for the assets involved in the transaction" and so will not
reflect the fair market value of assets any better than the net
book value.  A.R. 945-46.  That rationale is sufficient -- post-
hoc or not -- to support the interpretation at issue here.

St. Luke's also argues that the Secretary's change of course required a new rulemaking, subject to notice and comment. But interpretative clarifications do not require notice and comment. 5 U.S.C. § 553(b)(A). Nor can there be any doubt that the policy at issue here is properly an informal interpretation. See Albert Einstein, 566 F.3d at 381 (finding this change only an interpretive clarification); Via Christi Reg'l, 509 F.3d at 1271 n.11 (same).  The materials identified by St. Luke's to substantiate the existence of a prior policy are themselves informal interpretations, and the bona fide sales requirement comes straight from the text of the existing rule itself.  See 42 C.F.R. § 413.132(f)(2).

St. Luke's makes three sundry arguments that may be quickly disposed of.  Its argument that the Deficit Reduction Act of 1984 precluded the Secretary from interpreting his regulations after that date is unsupported by the text of that act or any case law in its motion.  Its argument that Secretary failed to timely list the Program Memorandum in the Federal Register fails because St. Luke's has failed to show prejudice from this error. See 5. U.S.C. § 706.  And its argument that the Secretary failed to submit its interpretation to the House and Senate is precluded from judicial review.  Montanans for Multiple Use v. Barbouletos, 568 F.3d 225, 229 (D.C. Cir. 2009).

The only question left, then, is whether the
Secretary's finding that the St. Luke's merger was not a bona
fide sale was supported by substantial evidence.  It clearly was.
The sizable gap between the "purchase price" and the value of
Allentown's assets and the other circumstances surrounding the
merger are sufficient to support the Administrator's ruling.  At
the time of the merger, Allentown's current and monetary assets
alone were nearly double the value of the liabilities assumed;
its total assets were more than five times the "price".  The
Administrator's finding is thus supported by more than
substantial evidence, and in fact well demonstrates why a bona
fide sales requirement is necessary to prevent Medicare from
making payments that bear no relation to actual costs.  See
Albert Einstein, 566 F.3d 368; Robert F. Kennedy, 526 F.3d 557,
560-61; Via Christi Reg'l, 509 F.3d at 1277.



                                   JAMES ROBERTSON
                              United States District Judge